LAKE BARRINGTON CITIZENS COMMITTEE, INC., et al., Plaintiffs-Appellants, v. THE VILLAGE OF LAKE BARRINGTON et al., Defendants-Appellees.

(No. 73-290;

Second District—May 29, 1974.

*Rehearing denied June 26, 1974.*

Tenney & Bentley and Karaganis, Martin & Gail, both of Chicago, for appellants.

Eva Schwartzman, of Libertyville, and Morgan, Cook, Lanoff & Madigan and Peterson & Houpt, both of Chicago, for appellees.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The Lake Barrington Citizens Committee, Inc. and certain individuals filed a complaint for declaratory judgment asking that a certain ordinance of the Village of Lake Barrington (ordinance no. 72-0-3) be declared null and void. The trial court, after hearing the case on the pleadings and a stipulated set of facts, rendered judgment upholding the validity of the village ordinance from which judgment the plaintiffs appeal.

It should be noted at the outset that the plaintiffs do not contest the right of the village trustees to approve the contemplated planned unit development which is the subject of the contested ordinance nor do they attack the project itself on any ground having to do with public health, safety, morals or welfare. What they are contesting is the validity of ordinance no. 72-0-3 which, in connection with the approval of the planned development project, permitted the creation of multi-family dwellings in a zone designated R-2 under the existing zoning law.

As the basic issue raised by this appeal is the proper interpretation of certain sections of the Village's zoning ordinance, as amended, a brief history of the ordinance may be helpful in understanding the controversy.

In April 1960, the Village adopted a zoning ordinance providing for

only one residential zoning district, R-1, and one business district, B-1. The only residential use allowed under R-1 was single-family residences on 1-acre lots. In December 1960 the Village amended the zoning ordinance to create a new zoning district, R-2, which permitted single-family residences on 20,000 square foot lots. Any use permitted in R-1 was also permitted in R-2. In 1962 the Village added, by ordinance no. 52, a provision for "special uses" which permitted in R-1 and R-2, "any other type of use other than an industrial or manufacturing use, which requires permanent improvements whose value is in excess of $10,000 and/or where more than four persons are to be permanently employed in connection therewith."

Then, in 1964 the Village again amended the zoning ordinance by adopting ordinance no. 89, the ordinance which brings up the main question raised on this appeal. This ordinance created a new zoning district, R-3, which, besides permitting the uses permitted in R-1 and R-2, also provided in its section 4.8 that a planned development would be permitted as a special use *"in any zoning district* [emphasis ours] for the purpose of utilizing effectively the benefits inherent in unified land planning and development, including a more efficient and more economical development pattern, and a more attractive and varied arrangement of·structure types and open spaces than is possible under standard regulations for single district lots."

This section (4.8) of ordinance no. 89 also provided as follows:

"In the case of planned developments, the Board of Trustees may by ordinance authorize uses not otherwise permitted and modify regulations otherwise required in the area of said development when the Board of Trustees determines:

(a) That the uses permitted shall be for the purpose of developing an integrated site plan; and

(b) That the intensity of use permitted by such ordinance is necessary or desirable and is appropriate to the primary purpose of the development.

The adoption by the Board of Trustees of an ordinance or ordinances amending the Zoning Ordinance of the Village authorizing and approving a specific planned development with respect to a particular tract of land shall constitute a legislative determination that the regulations and requirements governing the types of uses for that particular tract are the only zoning and development requirements appropriate for that tract to the extent that such requirements and regulations are in conflict with any other ordinances and parts of ordinances."

But there was another section of ordinance no. 89 which dealt with

special uses. This was a new section—section 8.2—under article 8, reading as follows:

"*Article 8—R-3 General Residental District Regulations*

*8.1 Permitted Uses*

    (a) Any uses permitted in an R—2 District and shall be subject to such regulations provided in an "R-2" District for such uses.

*8.2 Special Uses*

    (a) Any use permitted as a special use in an R-2 District.

    (b) Multi-family dwellings if public or community sewer or water facilities are to be available and the multi-family dwellings are part of and processed as a planned development by the Plan Commission and approved by Ordinance adopted by the Board of Trustees."

■■ Under Illinois law there is a presumption of validity in favor of a zoning ordinance which has been duly adopted under a legislative grant of power. (*Siegel v. City of Chicago* (1970), 127 Ill.App.2d 84, 261 N.E.2d 802; *Midwest Bank & Trust Co. v. City of Chicago* (1971), 133 Ill.App.2d 518; *Citizens Bank & Trust Co. v. City of Park Ridge* (1972), 5 Ill.App.3d 77.) The burden of proving the ordinance here in question invalid is therefore strictly on the plaintiffs. As was said in *Midwest Bank & Trust Co. v. City of Chicago, supra,* p. 522:

"The rule to be applied in examining the evidence in a zoning case recognizes a presumption in favor of the validity of the legislative enactment, and the party attacking it has the burden of overcoming that presumption by clear and convincing evidence."

It is in the light of this rule that we proceed to consider the plaintiffs' challenge to the validity of the ordinance in question.

■■ We consider first the plaintiffs' contention that section 4.8 and section 8.2 of ordinance no. 89 are in conflict and that section 8.2, being specific on the subject of multiple-family dwellings, takes precedence over the general language of section 4.8 regarding planned developments. The plaintiffs point out that only in section 8.2 of the ordinance is the subject of multiple-family dwelling units mentioned and since section 8.2 comes under the heading "Article 8, R-3—General Residential District Regulations", they contend it was manifestly the intent of the framers of the zoning ordinance that multi-family dwellings be permitted only in a territory zoned R-3. That specific provisions take precedence over more general ones in construing a statute where the two provisions appear to be in conflict is a well recognized rule of construction. The case of *Niles Improvement Association v. J. E. Anderson & Son* (1968), 93

Ill.App.2d 167, 172, cited by plaintiffs on this point, cites *National Products Co. v. Du Page County* (1924), 314 Ill. 74, 145 N.E. 298, at pages 80 and 81, where the Illinois Supreme Court said: "It is a well settled rule of construction that where there are two provisions, one of which is general and designed to apply to cases generally, and another is particular and relates only to one subject, the particular provision must prevail and must be treated as an exception to the general provision." The law is clear on this point to the extent it applies to a particular situation. However, it must be borne in mind that the above announced rule is one of *construction*. Rules of construction are merely aids in construing a contract where the meaning or intent is not clear. The very case cited by the plaintiffs in support of the rule that the particular takes precedence over the general (*Niles Improvement Ass'n v. J. E. Anderson & Son, supra*), after announcing the rule, states: "Of course, these aforementioned rules cannot be used to defeat legislative intent." In *Illinois Bell Telephone Co. v. Fox* (1949), 402 Ill. 617, cited by both plaintiffs and defendants, the court said at pages 627-628:

> "As in the case of statutes, the primary rule for the construction and interpretation of ordinances is to ascertain and give effect to the intention of the law-making body. [Citations.] Furthermore, under familiar principles, a statute itself affords the best means of its exposition, and if the legislative intent can be ascertained from the provisions of the statute that intent will prevail without resort to other aids for its construction [Citations.]"

It is clear, therefore, that the legislative intent is controlling and where the intent can be ascertained from the legislation itself it is unnecessary and inappropriate to resort to the rules of construction to ascertain the meaning of the ordinance.

■■ Does the legislation itself provide us with any clues whereby to divine which of two possible constructions should be applied to the particular set of facts? Referring to the language of the zoning ordinance itself, we find the following in section 4.8:

> "The adoption by the Board of Trustees of an ordinance or ordinances amending the Zoning Ordinance of the Village authorizing and approving a specific planned development with respect to a particular tract of land shall constitute a legislative determination that the regulations and requirements governing the types of uses for that particular tract are the only zoning and development requirements appropriate for that tract to the extent that such requirements and regulations are in conflict with any other ordinances and parts of ordinances."

This language is, if nothing else, a clear indication of an intent by the framers of the village zoning law of 1964 which is here in question to allow flexibility to their successors in dealing with questions arising out of planned development projects. That such intended result was within the power of the village board is clear from many decisions holding that, " 'where there is a legitimate difference of opinion concerning the reasonableness of the classification, or where the question of reasonableness is fairly debatable, the courts will not and cannot interfere with legislative judgment * * *.' " (*Lindgren v. City of Chicago* (1970), 124 Ill. App.2d 289, 300, citing *Bredberg v. City of Wheaton* (1962), 24 Ill.2d 612, 182 N.E.2d 742).) It is logical to suppose that by inserting this language in the more general section of the ordinance relating to planned development the trustees intended that flexibility to be available for all types of uses including planned developments. We find it significant that the language quoted above is preceded by the following:

> "In case of planned developments the Board of Trustees may by ordinance authorize uses not otherwise permitted and modify regulations otherwise required in the area of such development when the Board of Trustees determines
>
> (a) That the uses permitted shall be for the purpose of developing an integrated site plan; and
>
> (b) That the intensity of use permitted by such ordinance is necessary or desirable and is appropriate to the primary purpose of the development."

The phrase "intensity of use" clearly can be applied to multiple dwellings, which are a more intense use of the land than a single-family dwelling on 40,000- or 20,000-square-foot lots.

We cannot subscribe to the plaintiff's theory that it was the intention of the framers of the zoning ordinance to prohibit the ordinary planned unit development as a special use in any R—2 district unless the usual feature of multiple dwelling units was eliminated.

■■ We are therefore of the opinion that there is no irreconcilable conflict between sections 4.8 and 8.2 of ordinance no. 89 merely on the basis that section 8.2 specifically refers to multiple-family dwelling units, whereas section 4.8 refers only to planned developments generally in a context suggesting such development as a special use. It follows, therefore, that it is not necessary to apply the rule of construction suggested by the plaintiffs that would require the conclusion that multiple-family dwellings were not contemplated under any part of the ordinance other than section 8.2 and therefore must come under R—3 zoning, which is the only zoning authorized under article 8. It is suggested by the plain-

tiffs that unless we hold that multiple-family dwelling units are permitted only under R—3 zoning we render at least a part of section 8.2 superfluous and meaningless and such a result is not acceptable in construing an ordinance. As stated above, however, where the legislative intent is clear, as we hold it is here, the question of construction is more theoretical than real. Paragraph (b) of section 8.2 may have been intended to merely emphasize the requirement that public sewers or water must be present for any multiple-family dwelling units in the newly created Zone 3, but in any event, the mere possibility of a redundance of one paragraph of one section is not sufficient to require the holding that an entire ordinance is invalid, where the legislative intent is clearly manifested by the ordinance as a whole.

The second contention of the plaintiffs is contained in the flat assertion that "ordinance provisions are invalid which attempt to include as special uses any uses other than industrial or manufacturing uses." Plaintiffs quote the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, sec. 11—13—1.1) in discussing this contention but a reading of this section of the statute compels us to the opposite conclusion. The section quoted by plaintiffs reads as follows:

> "The corporate authorities of any municipality may in its ordinances passed under the authority of this Division 13 provide for the classification of special uses. Such uses may include *but are not limited to* [emphasis ours] public and quasi-public uses affected with the public interest, uses which may have a unique, special or unusual impact upon the use or enjoyment of neighboring property, and planned developments."

██ While obviously it is undesirable to extend the "special use" classification indiscriminately to every conceivable type of use and we should heed the words of the Illinois Supreme Court in *Kotrich v. County of Du Page* (1960), 19 Ill.2d 181, 185:

> "And since granting a special use permit involves an *ad hoc* judgment which may affect surrounding property owners in the same way as a variation or an amendment, unlimited application of the special use technique to land uses that can readily be accommodated within the customary categories would undermine the protection contemplated by the statute."

We take these as words of caution and not of limitation. In the very case from which this language is taken the Illinois Supreme Court allowed as a special use the creation of a private country club, saying, at page 186, "In our opinion, a residual category of those special uses which can not, without distortion, be included in the customary classifications, is

permissible as a means of implementing the powers conferred by the statute."

The words of the Illinois Municipal Code quoted above, "but are not limited to" while not to be looked upon as a license, certainly import a great deal of flexibility in the determination by a municipality as to what may legitimately be classified as a "special use". The plaintiffs here quote the words "any use" appearing in the 1962 amendment of the Lake Barrington zoning ordinance as indicating that the ordinance sets no standards—that, "it appears that by the magic label, 'Special Use', the Village could allow in a residential district any kind of store, gas station, lumber sales yard, car wash, dog kennel, drive-in movie or hundreds of other uses". This is an exaggeration. The 1962 ordinance referred to carefully restricts the granting of special use permits as follows:

> "g. The granting of any 'Special Use' under subsection "f" above may be made subject to such conditions and regulations as the corporate authorities of the Village in their discretion consider necessary or desirable to *protect and safeguard the public health, safety, and welfare and the value and character of surrounding properties.* [Emphasis ours.] Such conditions as are thus imposed shall be considered and shall have the effect of legally binding regulations applicable to the premises with respect to which the 'Special Use' is granted, so that any violation of such conditions and regulations shall be considered direct violations of the Village's Zoning Ordinance for all legal purposes and subject any violator to such fines, penalties and other action as are provided by law for violators of the Zoning Ordinance of the Village of Lake Barrington."

In addition the zoning ordinance provides that special uses will be permitted only if approved subject to section 11—5 of the ordinance which says:

> "Special uses shall be considered and acted upon in the manner prescribed herein for amendments to this ordinance. In approving a special use the corporate authorities may impose such additional conditions not otherwise found in this ordinance as is considered necessary to protect the public health, safety and welfare."

Amendments to the zoning law may only be proposed after published notice and public hearing.

■■ With the safeguards present which are built into the Lake Barrington zoning law for the granting of special use permits, all of which were complied with here, there does not appear to be any danger that the flood gates will be opened for indiscriminate and injudicious use of this

zoning device. Caution should certainly be the watchword in granting special uses but we think the ordinance in question is clearly within the authority conferred on the Village by the Municipal Code and within the spirit of restraint appropriate to the use of this category.

The judgment of the trial court is affirmed.

T. MORAN, P. J., and GUILD, J., concur.