O. LARRY WOODHOUSE AND GERALD F. FRIEDMAN v. BOARD OF COMMIS-
SIONERS OF THE TOWN OF NAGS HEAD

No. 112

(Filed 1 February 1980)

1. **Municipal Corporations § 30.6— conditional use permit—prima facie showing**

An applicant for a conditional use permit is *prima facie* entitled to the
permit where he produces competent, material and substantial evidence tend-
ing to establish the existence of the facts and conditions which the ordinance
requires for the issuance of such a permit.

2. **Municipal Corporations § 30.6— conditional use permit—planned unit
development—denial on ground of "unsuitability"**

A town's board of commissioners improperly denied an application for a
conditional use permit for a planned unit development on the ground that the
planned unit development did not meet the test of suitability as outlined in the
intent section of the zoning ordinance since a planned unit development, as a
specified "conditional use," was by definition in accord with the purpose and
intent of the ordinance, and since the commissioners could not deny such a per-
mit in their unguided discretion on the ground of "unsuitability."

3. **Municipal Corporations § 30.6— conditional use permit—planned unit
development—compliance with specific ordinance requirements—no burden to
show adequacy of public fire-fighting facilities**

Where the applicants for a conditional use permit met their burden of
showing compliance with the specific standards and requirements of the or-
dinance for such a permit, the applicants had no burden to establish the ade-
quacy of public facilities, including fire-fighting facilities, for the planned
development, and the denial of the permit on the basis of a finding that the
planned unit development potentially outstrips community fire-fighting equip-
ment was erroneous in the absence of evidence to support such a finding.

4. **Municipal Corporations § 30.6— conditional use permit—planned unit
development—denial on ground sewage plant would be nuisance**

A town's board of commissioners erred in denying a conditional use
permit for a planned unit development on the ground that "the installation of a
wastewater treatment facility in the midst of a residential complex would be
the equivalent of taking a nuisance to the property owners in the area" since
the board relied on incompetent testimony by neighboring landowners concern-
ing odors emanating from sewage facilities at nearby motels and their fears of
experiencing similar problems with the proposed plant, the board of commis-
sioners was empowered under the ordinance to impose conditions and restric-
tions on the proposed sewage facilities, and the applicants were at all times
willing to comply with those conditions.

5. **Municipal Corporations § 30.6— conditional use permit—planned unit
development—no restriction on types of dwellings**

A town's board of commissioners erred in denying a conditional use per-
mit for a planned unit development in an R-2 zone on the ground that the

planned development included multi-family dwellings which were not permitted in an R-2 zone since (1) a provision of the zoning ordinance stating that "additional uses permitted to be established in a special Planned Unit Development shall only be those uses permitted in the Low Density Residential (R-1) zoning district" referred to uses in addition to residential uses, and a planned unit development could thus include residential uses and any nonresidential uses permitted in an R-1 zone, including churches, cemeteries, schools and parks, and (2) there was no restriction on the types of residential dwellings permitted in a planned unit development regardless of the particular zoning restrictions in the district in which the development was located.

ON discretionary review to review the decision of the North Carolina Court of Appeals, reported in 41 N.C. App. 473, 255 S.E. 2d 249 (1979), which reversed the judgment of *Fountain, J.,* entered 17 April 1978 Session of DARE Superior Court, reversing the Nags Head Board of Commissioners' denial of petitioners' application for a conditional use permit.

During the fall of 1977, petitioners O. Larry Woodhouse and Gerald F. Friedman applied to the Board of Commissioners of the Town of Nags Head for a conditional use permit in order to use certain property as a planned unit development (hereinafter referred to as "PUD"). The proposed 5.548 acre site was located in an area zoned R-2, or medium density residential. The proposed PUD would consist of thirty-two dwelling units, a sewage treatment plant, two tennis courts, a handball court and parking facilities.

Petitioners' application was initially considered and substantially approved by the Planning Board of the Town of Nags Head. The application, along with certain recommendations submitted by the Planning Board, was then considered during an open meeting of respondent Board of Commissioners (hereinafter referred to as "Board") on 6 January 1978. The Board heard from petitioners and other interested parties and discussed petitioners' application. The Board then tabled the matter pending its referral of the application to the Board's engineering firm and other appropriate parties to permit further review of the impact of the proposed use on the Town of Nags Head.

The Board again considered petitioners' application during an open meeting on 6 March 1978. After hearing from petitioners and interested persons, the members of the Board discussed the matter in the meeting and denied the application by a vote of three to two.

The Board of Commissioners gave the following reasons in support of its denial of the application:

(1) The planned development does not meet the test of suitability as specified in Section 9.01(b) of the ordinance;

(2) The planned development potentially outstrips community fire-fighting facilities or services;

(3) The installation of a waste water treatment facility in the midst of a residential complex would be the equivalent of taking a nuisance to the property owners in the area.

(4) The Board of Commissioners cannot find that it is empowered to grant the conditional use permit because multi-family dwellings are not permitted as a matter of right in an R-2 zone and to permit them as part of a planned unit development would alter the basic character of the R-2 zone.

(5) The Board of Commissioners cannot find that the granting of the conditional use permit will not adversely affect the public interest.

Petitioners in apt time petitioned the trial court for a writ of certiorari pursuant to G.S. 160A-388 seeking judicial review of the decision of respondent Board. The trial court, Fountain, J., issued the writ on 29 March 1978. After a hearing on the matter, Judge Fountain concluded that the Board's denial of the application was not supported by competent, material and substantial evidence in the record. The trial court accordingly reversed and remanded the proceeding to the Board of Commissioners directing that approval be granted for the conditional use and that processing of the application be continued in accord with the applicable provisions of the zoning ordinance.

Respondent Board appealed to the Court of Appeals. In an opinion by Judge Mitchell, Judges Parker and Martin (Harry C.) concurring, the Court of Appeals held that, while no competent evidence supported the Board's finding number two regarding fire-fighting facilities, the burden of proving the existence of such facilities was on petitioners. As a result of this conclusion, the Court of Appeals reversed the trial court.

We allowed petitioners' petition for discretionary review pursuant to G.S. 7A-31 on 11 September 1979.

Other facts which are pertinent to our review of this case will be discussed in the opinion.

*Leroy, Wells, Shaw, Hornthal, Riley & Shearin, P.A., by Norman W. Shearin, Jr., and Dewey W. Wells, for petitioners.*

*Kellogg, White & Evans, by Thomas L. White, Jr., and Thomas N. Barefoot, for respondent.*

BRANCH, Chief Justice.

The central issue before us is whether the Board of Commissioners of the Town of Nags Head correctly denied petitioners' application for a special use permit to construct a planned unit development.

On 20 July 1977, the Town of Nags Head adopted its current zoning ordinance. Article VII, "Schedule of District Regulations," provides for several basic zoning areas ranging from R-1 (low density residential) to C-2 (general commercial). The parties in this action have stipulated that the proposed development site is located in a district zoned R-2, or medium density residential district. Section 7.02 of Article VII lists the applicable provisions for this particular zone and reads in pertinent part as follows:

A. *Intent*

> The R-2 District is intended to encourage the development of moderate density residential neighborhoods with a mix of permanent and short-term seasonal residents, and to serve as a transition zone between the low-density area and more intensely developed areas. The maximum density shall not exceed six (6) dwelling units per acre for Planned Unit Development.

B. *Permitted Uses*

> The following uses shall be permitted by right:

> (1) Detached single-family dwellings (not to include trailers or mobile homes).

(2) Duplexes with each unit subject to the dimensional requirements for single-family dwellings in the district except for the side yards required at any common walls.

(3) Customary accessory buildings including private swimming pools, private docks and bulkheads.

C. *Conditional Uses Permitted*

The following uses are permitted subject to the requirements of this district and additional regulations and requirements imposed by the Board of Commissioners as provided in Article X:

(1) Churches and cemeteries

(2) Cottage courts

(3) Fire stations, schools and other public buildings

(4) Fishing piers

(5) Home occupations as defined in Section 4.02 of this ordinance

(6) Private parks and playgrounds

(7) Public utility facilities

(8) Planned Unit Development under the provision of Article IX

D. *Dimensional Requirements*

All permitted and conditional uses within the R-2 Residential District, unless otherwise specified, shall comply with the dimensional requirements shown in tabular form in Section 7.07.

Specifically included as a conditional use in this zone is a "Planned Unit Development under the provisions of Article IX." Petitioners proceeded to follow the procedures outlined in Article IX in order to qualify for a conditional use permit.

[1] A conditional use permit "is one issued for a use which the ordinance expressly permits in a designated zone upon proof that certain facts and conditions detailed in the ordinance exist."

*Refining Co. v. Board of Aldermen,* 284 N.C. 458, 467, 202 S.E. 2d 129, 135 (1974); *In re Application of Ellis,* 277 N.C. 419, 178 S.E. 2d 77 (1970). Where an applicant for a conditional use permit produces "competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of a special use permit, *prima facie* he is entitled to it." *Refining Co. v. Board of Aldermen, supra* at 468, 202 S.E. 2d at 136.

[2]   The Board gave as its first reason for denial of the application that the PUD did·not "meet the test of suitability as specified in Section 9.01 B of the ordinance." That section sets forth the intent of Article IX to permit PUDs "in areas which are suitable with respect to location, size, and physical character for development as units." The section then lists several factors for consideration of "suitability," including the goals and objectives of the Land Development Plan, physical characteristics of the site and the nature of the surrounding development.

In support of the Board's first reason, Commissioner Bryan noted that "the proposed development contravenes several of the goals and objectives of the land use plan . . . ." A PUD, however, is listed in the ordinance as a "conditional use" and a "conditional use," as defined in the Nags Head Ordinance, is "a use that would not be appropriate generally or without restriction throughout a particular Zoning District but which, if controlled . . . *would preserve the intent of this ordinance* . . . ." (Emphasis added.) A PUD, as a specified "conditional use," then, is by definition in accord with the purpose and intent of the ordinance. *Keiger v. Winston-Salem Board of Adjustment,* 278 N.C. 17, 178 S.E. 2d 616 (1971).

> The inclusion of the particular use in the ordinance as one which is permitted under certain conditions, is equivalent to a legislative finding that the prescribed use is one which is in harmony with the other uses permitted in the district.

A. Rathkopf, 3 *Law of Zoning and Planning,* 54-5 (1979).

Furthermore, the denial of an application on grounds that the proposed plan "does not meet the tests of suitability" as outlined in the intent section of a particular ordinance is no different from refusing a permit because the proposed use would "adversely af-

fect the public interest." A board of commissioners "cannot deny applicants a permit in their unguided discretion or, stated differently, refuse it solely because, in their view, [it] would 'adversely affect the public interest.' "[1] *In re Application of Ellis, supra* at 425, 178 S.E. 2d at 81; *Keiger v. Winston-Salem Board of Adjustment, supra.*

[3] The denial of the permit on the ground that the planned development potentially outstrips community fire-fighting facilities is equally untenable. Petitioners maintain that the reason stated by the Board as ground for denial of the application was not supported by competent, material and substantial evidence in the record. They further contend that they showed the "existence of facts and conditions" required by Article IX for the issuance of a special use permit, and therefore the permit should have been issued.

Respondent contends that petitioners failed to prove the adequacy of the public fire-fighting facilities to protect the development and the surrounding areas in general. Respondent bases this contention on the following langauge of the Article dealing exclusively with PUDs and found in section 9.01 D:

PUDs shall be appropriately located with respect to intended functions, to the pattern and timing of development existing . . . and to public and private facilities, existing or clearly to be available by the time development reaches the stage where they will be needed.

It is well settled that an applicant has the initial burden of showing compliance with the standards and conditions required by the ordinance for the issuance of a conditional use permit. *See Refining Co. v. Board of Aldermen, supra.* The parties here have stipulated that Section 9.03, "Planned Unit Development Standards and Requirements," has been complied with insofar as it is applicable. Nevertheless, respondents further contend that petitioners failed to meet their burden of showing the adequacy of public and private facilities. On the other hand, petitioners take the position that no such additional burden was placed upon them in order to obtain the permit.

---

1. Respondent has conceded in its brief that Finding Number 5 is invalid under the rule of *In re Application of Ellis, supra.*

The Court of Appeals agreed with petitioners that no compe-
tent evidence appeared in the record to support the Board's find-
ing that the PUD "potentially outstrips community fire-fighting
facilities." However, the Court of Appeals held that petitioners
had the burden of establishing the adequacy of fire-fighting
facilities as a standard or condition required by the ordinance. In
so holding, the court found that the lack of evidence in the record
was a direct result of petitioners' failure to meet their burden to
put on evidence of compliance with this condition.

The resolution of this question turns on a construction of Ar-
ticle IX of the Nags Head Zoning Ordinance. That Article is en-
titled "Planned Unit Development as a Conditional Use" and deals
exclusively with practices and procedures for the establishment
of PUDs. The first section of the Article, 9.01, is entitled
"Planned Unit Development Concept" and contains the definition
of a PUD, the intent of the Article, certain specific procedural re-
quirements and the section upon which respondents rely here.
Section 9.02 lists additional procedural steps for review of
development plans. Section 9.03 is entitled *"Planned United
Development Standards and Requirements"* (emphasis supplied)
and outlines certain specific conditions including minimum size,
maximum density and minimum lot area permitted in a PUD. This
particular section is the only section found in Article IX which
states the specific standards for PUDs. Petitioners and respond-
ent stipulated that *all* provisions of this section have been met
with the exception of 9.03C which is inapplicable to this case.

"The granting of a special exception is apparently not too
generally understood. It does not entail making an exception to
the ordinance but rather permitting certain uses which the or-
dinance authorizes under stated conditions. In short, a special ex-
ception is one allowable when the facts and conditions specified in
the ordinance as those upon which the exception is permitted are
found to exist." *Syosset Holding Corp. v. Schlimm*, 159 N.Y.S. 2d
88, 89, *modified on other grounds*, 4 A.D. 2d 766, 164 N.Y.S. 2d
890 (1956). (Emphasis deleted.) A board of commissioners "may
grant or deny a special permit solely on the basis of the specific
authority delegated by the regulations, and subject to the limita-
tions imposed thereby." R. Anderson, 3 *American Law of Zoning
2d* § 19.19 (1977). The board is "without power to deny a permit
on grounds not expressly stated in the ordinance" and it must

employ specific statutory criteria which are relevant. *Id.* "[W]here a zoning ordinance specifies standards to apply in determining whether to grant a special use permit and the applicant fully complies with the specified standards, a denial of the permit is arbitrary as a matter of law." *Hay v. Township of Grow,* 296 Minn. 1, 5, 206 N.W. 2d 19, 22 (1973).

In the instant case, petitioners have fully complied with the applicable specific conditions set forth in Article IX's section on "Standards and Requirements" and the parties have so stipulated. There are numerous sections in Article IX which list general considerations for determining the appropriateness of a particular PUD, including the section upon which respondent relies here. To hold that an applicant must first anticipate and then prove or disprove each and every general consideration would impose an intolerable, if not impossible, burden on an applicant for a conditional use permit. An applicant "need not negate every possible objection to the proposed use." Anderson, *supra* § 19.19. Furthermore, "once an applicant . . . shows that the proposed use is permitted under the ordinance and presents testimony and evidence which shows that the application meets the requirements for a special exception, the burden of establishing that such use would violate the health, safety and welfare of the community falls upon those who oppose the issuance of a special exception." *West Whiteland Township v. Exton Materials Inc.,* 11 Pa. Cmwlth. 474, 479, 314 A. 2d 43, 46 (1974); *Appeal of College of Delaware County,* 435 Pa. 264, 254 A. 2d 641 (1969).

In this case, there is no competent evidence appearing in the record to support the finding by the Board that "the planned development potentially outstrips community fire-fighting facilities." Crucial findings of fact which are unsupported by competent, material and substantial evidence in view of the entire record as submitted cannot stand. *Refining Co. v. Board of Aldermen, supra.* Since no competent evidence supports the Board's finding, and since petitioners met their burden of showing compliance with the specific requirements of the ordinance, we hold that the finding cannot stand.

Moreover, we note that Commissioner Bryan conceded that the concern over fire-fighting facilities would exist regardless of the type of use or development of the property involved here. In *Nalitt v. Millburn,* 66 N.J. Super. 292, 168 A. 2d 864 (1961), a con-

ditional use permit for a bowling alley was denied because of the "difficulty in furnishing relatively prompt police and fire protection" to the particular location. In holding this finding invalid, the court there stated:

> . . . if this thesis be true as it applies here, it would be equally true in its application to any structure which might be erected on the site, the logical result then being that the lands would remain in an unimproved condition and the owners thereof would be deprived of the right to put the premises to the uses authorized by the ordinance itself.

*Id.* at 299, 168 A. 2d at 868.

[4]   The third finding by the Board in this case was that "the installation of a wastewater treatment facility in the midst of a residential complex would be the equivalent of taking a nuisance to the property owners in the area." This finding was apparently based on abundant testimony from neighboring landowners concerning odors emanating from sewage facilities located at nearby motel establishments. Since the sewage plant proposed here is similar to those at the motels, the landowners expressed fears of experiencing similar problems with the proposed plant.

Petitioners, however, tendered experts who testified regarding the differences between existing facilities and the proposed facility. Furthermore, Mr. Ed Fleace, a registered engineer with an engineering firm representing the Town of Nags Head, testified: "[A]s I commented in my letter back on January the 26th, we concur that the type of treatment facilities proposed here should be—is the type of treatment facility that would provide excelent [sic] treatment for these type [sic] of waste in this situation."

The evidence relied upon by the respondent Board to support its finding is incompetent as opinion testimony and is highly speculative in nature. "The denial of a special exception permit may not be founded upon conclusions which are speculative, sentimental, personal, vague or merely an excuse to prohibit the use requested." *Baxter v. Gillispie*, 60 Misc. 2d 349, ---, 303 N.Y.S. 2d 290, 296 (1969). *See Refining Co. v. Board of Aldermen, supra.* Such a permit may not be denied on the ground that the use may be so conducted as to become a nuisance. *Baxter v. Gillispie,*

*supra.* Evidence that similar sewage plants gave off offensive odors is insufficient standing alone to show that petitioners' plant will do likewise. *Zautner v. Magony,* 28 App. Div. 2d 791, 281 N.Y.S. 2d 260 (1967). Such evidence is hypothetical as to the operation of the proposed plant. *Id.*

Furthermore, we note that the submission to the Board of Commissioners of the plans for a proposed PUD is a preliminary stage in the process of establishing such a development. During the course of the hearings involved here, all parties constantly noted that it was too soon to determine some issues with finality and that certain potential problems could be worked out as the project progressed. The ordinance itself provides that upon approval by the Board of Commissioners, "the developer is required to submit *final detailed* plans of the proposed PUD to the Planning Board." (Emphasis added.) Applicants are then subjected to further compliance with provisions regarding subdivision regulations and building permits. The ordinance also provides:

> In granting any Conditional Use Permit, the Board of Commissioners may prescribe appropriate conditions and safeguards in conformity with this ordinance. Violation of those conditions and safeguards, when made a part of the terms under which the conditional use permit is granted, shall be considered a violation of this ordinance and will be punishable under Article XVIII of this ordinance.

Petitioners here acknowledged their willingness to cooperate and to comply with recommendations for changes in the sewage plant. *In Appeal of College of Delaware County, supra,* the municipal governing board denied a conditional use permit on the basis of a "potential sewerage problem." In holding that this was not a valid reason for denial of the permit, the court noted that once the permit is granted, the applicant would be required to make arrangements to comply with the state and local regulations. *See also Crowther, Inc. v. Johnson,* 225 Md. 379, 170 A. 2d 768 (1961); *Holmes & Murphy, Inc. v. Bush,* 6 App. Div. 2d 200, 176 N.Y.S. 2d 183 (1958).

The hypothetical nature of the concerns over the sewage plant, together with the fact that the Board of Commissioners was empowered under the ordinance to impose conditions and restrictions upon the proposed sewage facilities in this case, and

the fact that petitioners were at all times willing to comply with those conditions, dictate the conclusion that this third reason for denial of the permit cannot stand. We so hold.

[5] The Board of Commissioners gave as its fourth ground for denial that it could not find that it was empowered to grant the conditional use permit requested because multi-family dwellings are not permitted as a matter of right in an R-2 zone and to permit them as part of a PUD would alter the basic character of the R-2 zone. Respondent relies primarily on this reason to support its denial of petitioners' request.

Respondent contends that, while PUDs are permitted as conditional uses in an R-2 zone, only those PUDs are permitted which conform to the uses as of right in an R-2 zone. An R-2 zone only provides for single-family residences or duplexes as a matter of right. Since petitioners' proposed PUD includes mutli-family dwellings, respondent argues that the proposed development cannot be approved in this particular zone.

Respondent relies on the following underlined language in Article IX to buttress its contention:

SECTION 9.04 — USES PERMITTED

    A. *Additional uses permitted to be established in a special Planned Unit Development shall only be those uses permitted in the Low Density Residential (R-1) zoning district,* except that:

       (1) In developments comprising one hundred (100) or more dwelling units, "convenience" commercial establishments may be permitted to be established to provide the following services and facilities for residents of the development and their guests.

         a. food stores

         b. drug stores

         c. barber or beauty shops

         d. restaurants

         e. professional offices

(2) Total maximum floor area of all convenience commercial uses established as part of any project shall not exceed five (5) percent of the total floor area of the project, or twenty-five thousand (25,000) square feet, whichever is less.

(3) Off-street parking areas shall be provided for each use as required by Section 6.01 of this Ordinance.

(4) Uses established shall be designed and scaled to meet only the needs of residents of the development and their guests.

(5) One non-illuminated sign shall be permitted per use established. Maximum sign area shall be ten (10) square feet.

(6) No commercial use, or sign established therewith, shall be visible from any adjacent street.

B. Building permits shall be issued for "convenience" shopping facilities only after permits have been obtained by the developer for the minimum number of dwelling units required as a prerequisite for those facilities.

C. Business licenses shall be issued for "convenience" shopping operations only after at least fifty percent (50%) construction has been completed on all the minimum required dwelling units.

We note, initially, that the ordinance before us is hardly a model of clarity. While expressly setting out density and lot size requirements, the Article governing PUDs nowhere mentions the uses contemplated; yet, Section 9.04, entitled "Uses Permitted," authorizes certain *additional uses.*

Respondent maintains that the word "additional" means "in addition to uses already permitted in a particular zone." In short, the uses permitted in a PUD would be confined to those already permitted under the traditional zoning regulations of a district, plus those permitted in an R-1 zone.

The section of the ordinance governing the R-1 district reads in pertinent part as follows:

SECTION 7.01—R-1 LOW DENSITY RESIDENTIAL DISTRICT

A. *Intent*

The R-1 district is intended to encourage the development of permanent low-density residential neighborhoods. The maximum density shall not exceed 3.5 dwelling units per acre for Planned Unit Development.

B. *Permitted Uses*

The following uses shall be permitted by right:

(1) Detached single-family dwellings (not to include trailers or mobile homes).

(2) Customary accessory buildings including private swimming pools, private docks and bulkheads.

C. *Conditional Uses Permitted*

The following uses are permitted subject to the requirements of this district and additional regulations and requirements imposed by the Board of Commissioners as provided in Article X:

(1) Churches and cemeteries

(2) Fire stations, schools and other public buildings

(3) Home occupations as defined in Section 4.02 of this ordinance

(4) Private parks and playgrounds

(5) Public utility facilities

(6) Planned Unit Development under the provisions of Article IX

Petitioners contend that an R-2 district permits as a conditional use a "Planned Unit Development under the provisions of Article IX." Article IX specifically enumerates the density requirements for each zoning district, as well as lot size and number of buildings permitted. The Article, however, nowhere mentions the *type* of dwellings permitted in particular districts. Petitioners argue that the purpose of a planned unit development, as set out

in the ordinance, is to "achieve flexibility of design, the integration of mutually compatible uses and optimum land planning . . . ." They maintain that the very essence of the PUD concept presupposes a variety of dwelling types.

Finally, petitioners note that if there is a conflict between Article IX provisions and the provisions of the section on R-2 zoning, the ordinance by its own terms provides that the PUD provisions control.

The rules applicable to statutes apply equally to the construction and interpretation of municipal ordinances. *Perrell v. Beaty Service Co.*, 248 N.C. 153, 102 S.E. 2d 785 (1958). Ordinances, like statutes, must be construed as a whole. *State v. Fox*, 262 N.C. 193, 136 S.E. 2d 761 (1964). An ordinance will be given a reasonable interpretation and, if possible, its provisions will be reconciled and harmonized. *Cogdell v. Taylor*, 264 N.C. 424, 142 S.E. 2d 36 (1965).

In terms of the accepted rules of statutory construction alone, respondent's interpretation of the ordinance here is untenable. Section 9.04 states that *additional* uses "shall only be those uses permitted in" the R-1 district. The R-1 district, however, permits the absolute minimum in terms of allowable uses, and by its own terms is to encourage "low-density residential neighborhoods." Moving up the scale of residential districts, we note that the R-2 zone permits a slightly greater variety of permitted and conditional uses, and the R-3 zone still more. The R-2 zone, for example, permits single-family dwellings and duplexes as of right, and permits as conditional uses all of the conditional uses permitted in the R-1 zone, plus fishing piers and cottage courts. According to respondent's interpretation of Section 9.04, a proposed PUD in an R-2 zone could include the uses permitted there, and *in addition*, those uses permitted in an R-1 zone. This position is unsound, since, as we have shown, the R-2 zone already permits more than is permitted in an R-1 zone. There is nothing *additional* in permitting *fewer* uses than already exist in a district.

Statutes should be construed so as to avoid absurd results. *Person v. Garrett*, 280 N.C. 163, 184 S.E. 2d 873 (1971). The intent and spirit of an act are controlling in its construction. *Queen City Coach Co. v. Currie*, 252 N.C. 181, 113 S.E. 2d 260 (1960). In ascer-

taining this intent, the courts should consider the terms of the enactment, the spirit of the act and what it sought to accomplish, and the changes to be made and how these should be effected. *Stevenson v. Durham*, 281 N.C. 300, 188 S.E. 2d 281 (1972).

The obvious intent of Article IX of the ordinance before us is to provide a means for implementing a planned unit development. A planned unit development, or PUD, is the development of a tract of land as a single entity which may include dwellings of various types, commercial uses, and sometimes industrial uses. 2 Anderson, *supra*, § 11.13. Such a planned unit "enables the builder to create, within the confines of a single development, a variety of housing types which . . . will [enhance] the possibilities of attractive environmental design and [provide] the public with open spaces and other common facilities." G. Lloyd, *A Developer Looks at Planned Unit Development*, 114 U. Pa. L. Rev. 3, 4 (1965). The concept of a PUD is frequently limited in practice to residential developments of various sizes having a variety of housing in addition to recreation areas and perhaps some retail establishments. 82 Am. Jur. 2d, *Zoning and Planning*, § 106 (1976).

The PUD "is a legislative response to changing patterns of land development and the demonstrated shortcomings of orthodox zoning regulations . . . . Currently, the improvement of land is in the control of developers who assemble large tracts and improve the land for resale or rental. Given this modern pattern of land development, planners and legislators conceived a technique of land-use control which was better adapted to the realities of the marketplace." 2 Anderson, *supra*, § 11.12. Planned unit developments make it possible "to insure against conflicts in the use of land while permitting a mix of uses in a single district." *Id.* The PUD concept "has freed the developer from the inherent limitations of the lot-by-lot approach and thereby promoted the creation of well-planned communities." 82 Am. Jur. 2d, *supra.*

The most prominent feature of a PUD, and perhaps its most frequently-cited virtue, is flexibility. *Lake Barrington Citizens Committee, Inc. v. Village of Lake Barrington*, 19 Ill. App. 3d 648, 312 N.E. 2d 337 (1974); 2 Anderson, *supra*, § 11.14; B. Hanke, *Planned Unit Development and Land Use Intensity*, 114 U. Pa. L. Rev. 15 (1965); 82 Am. Jur. 2d, *supra.* The very heart of a planned unit development is the notion that it may diverge from zoning

regulations established in any one or more districts. *Doran Investments v. Muhlenberg Township*, 10 Pa. Cmwlth. 143, 309 A. 2d 450 (1973). Furthermore, where a PUD is established by means of a conditional use permit, the specifications for the PUD are those found in the exception clauses of the ordinance. *Doran Investments v. Muhlenberg Township, supra;* Freilich & Quinn, *Effectiveness of Flexible and Conditional Zoning Techniques — What They Can and What They Can Not Do for Our Cities*, Inst. on Planning, Zoning, and Eminent Domain, 167 (Southwestern Legal Foundation, Dallas, Texas, 1979).

With this background in mind, we turn now to the Zoning Ordinance before us. The regulations governing the R-2 district involved here expressly permit the establishment of a PUD "under the provisions of Article IX." Article IX expressly provides that where conflicts occur between the PUD provisions and other provisions, the PUD provisions control. Therefore, we hold that the provisions of Article IX control the establishment of this planned unit development. *Doran Investments v. Muhlenberg Township, supra.*

Article IX defines a planned unit development "as the complete development of land which is under central control, or for which central control mechanisms have been established." The Article is intended to "provide a means of regulating development which can achieve flexibility of design, the integration of mutually compatible uses, and optimum land planning with greater efficiency, convenience, and amenity than the procedures and regulations under which it is permitted as of right under conventional zoning requirements."

Article IX nowhere mentions the *types* of residential dwellings permitted in a PUD. The Article does set forth the maximum density allowable in each residential district. The Article then provides for certain "additional uses," limited to the uses permitted in an R-1 zone.

Numerous authorities note that a PUD consists mainly of residential uses. 2 Anderson, *supra* § 11.22; Lloyd, *supra*; 82 Am. Jur. 2d, *supra.* The ordinance here permits PUDs in each of the residential districts, but does not permit a PUD in any strictly commercial district. Moreover, the section of Article IX just

preceding the "additional uses" section deals specifically with the requirements for "dwelling units."

In our view then, it is obvious that the drafters of Article IX contemplated that a PUD would consist primarily of residential buildings. We therefore conclude that the term "additional uses" as used in Section 9.04 refers to "uses in addition to residential uses." In other words, as we construe Section 9.04, a PUD may include residential uses and in addition, any non-residential uses permitted in an R-1 zone, including churches, cemeteries, fire stations, schools and parks. Section 9.04 then goes on to permit a PUD, in certain cases not applicable here, to expand further by establishing a limited variety of retail facilities.

We turn now to the question of whether the *types* of residential dwellings permitted in a PUD may diverge from those permitted in the particular district under traditional zoning regulations. Since we have concluded that the provisions of Article IX control the establishment of a PUD, the intent and spirit of those provisions must control. As we have noted, based on abundant authority, the primary virtue inherent in PUD legislation is flexibility. 2 Anderson, *supra,* § 11.14; Hanke, *supra;* 82 Am. Jur. 2d, *supra.* Moreover, authorities concur that the planned unit development concept contemplates "dwellings of various *types.*" 2 Anderson, *supra,* § 11.13 (emphasis added); Lloyd, *supra;* 82 Am. Jur. 2d, *supra.*

In light of what we perceive to be the intent and purpose of planned unit developments in general, and this planned unit development in particular, we hold that under this ordinance, there is no restriction on the *types* of residential dwellings permitted in a PUD, regardless of the particular zoning restrictions in the district in which the PUD is located.

Our holding is entirely consistent with decisions of other courts which have considered this issue. *See, e.g., Lake Barrington Citizens Committee, Inc. v. Village of Lake Barrington, supra; Chandler v. Kroiss,* 291 Minn. 196, 190 N.W. 2d 472 (1971); *Doran Investments v. Muhlenberg Township, supra.* In all of the cited cases, PUDs consisting of multi-family dwellings were proposed for areas zoned as single-family districts. In each case, opponents of the PUD contended that the PUD would alter the basic character of the single-family district. The court in each

case, noting the nature and purpose of a PUD, upheld the establishment of the multi-family dwellings, despite the single family limitation found in the regular zoning ordinance. As the court in *Doran Investments v. Muhlenberg Township* stated, "It is the very essence of a planned residential development that it may diverge from zoning requirements."

*Id.* at 155, 309 A. 2d at 457.

The decision of the Court of Appeals is reversed, and this cause is returned to the Court of Appeals with direction that it be remanded to the Superior Court of Dare County for reinstatement of that court's judgment.

Reversed.