**AT & T WIRELESS PCS, INC., Plaintiff,**

v.

**The WINSTON–SALEM ZONING BOARD OF ADJUSTMENT, Defendant.**

**No. 1:97CV01246.**

United States District Court, M.D. North Carolina.

June 12, 1998.

---

James G. Middlebrooks, Smith, Helms, Mulliss & Moore, Charlotte, NC, for Plaintiff.

Ronald G. Seeber, Office of City Atty., Winston–Salem, NC, Nancy Benton Essex, Poyner & Spruill, L.L.P., Raleigh, NC, Charles C. Green, Jr., Office of Winston–Salem City Atty., Winston–Salem, NC, for Defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

This matter comes before the court on Defendant The Winston–Salem Zoning Board of Adjustment's motion for dismissal and the parties' cross-motions for summary judgment. The court will enter an order granting Plaintiff's motion.

Plaintiff AT & T Wireless PCS, Inc. (AWS) is one of several entities licensed by the Federal Communications Commission to provide wireless telephone services in Winston–Salem, North Carolina. To provide services, AWS constructs a network of antennae throughout the Winston–Salem area. This lawsuit follows the denial by The Winston–Salem Zoning Board of Adjustment (Board) of a special use permit to erect a 148–foot monopole antenna tower.

Winston–Salem's zoning ordinance, which is part of the city's Unified Development Ordinance (UDO), zones the proposed area of construction "IP," which means that the land may be used for institutional and public purposes. Under the UDO, a transmission tower is a permitted use within the IP zoning, subject to the acquisition of a special use permit. In October 1997, the City/County Planning Board approved AWS's site plan for the proposed tower, indicating that the AWS tower meets or exceeds the UDO's technical requirements. AWS applied to the Board for a special use permit and a hearing was held on November 6, 1997. On the same day, the Board rejected AWS's application by writing "Denied" over the Board's stamp imprint on AWS's application. On December 5, 1997, AWS filed this action seeking an injunction or writ of mandamus for alleged violations of the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) (TCA).[1] After

---

1. The relevant portions of the TCA:
   (7) Preservation of local zoning authority
     (A) General Authority
       Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
     (B) Limitations

requesting and receiving an extension of time, the Board filed its Answer on February 11, 1998. On February 20, 1998, the Board issued a written opinion explaining its rejection of AWS's application.

## I. Abstention

■ Federal courts are under a strict duty to exercise the jurisdiction that is conferred upon them by Congress. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 713, 116 S.Ct. 1712, 1720, 135 L.Ed.2d 1 (1996). In the face of exceptional circumstances, the court may decline to exercise jurisdiction where denying a federal forum would clearly serve an important countervailing interest. *Id.* The Court has established that when adequate state court review is available, a district court sitting in equity should abstain from interfering with the orders or proceedings of state administrative agencies when the conflict involves difficult questions of state law with substantial public policy implications, or when federal review would disrupt state efforts to establish a coherent policy in an area of substantial public concern. *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989).

In its motion to dismiss, the Board urges the court to abstain from asserting jurisdiction over this action. The Board provides four arguments for abstention: (1) this case deals with issues of land use planning, an area in which federal courts traditionally defer to local government; (2) the Board's decision is based upon an extensive state and local regulatory scheme designed for appeal to state courts; (3) the state courts have experience and familiarity with the case law involving appeals of land use planning decisions; and (4) state statutes mandate that the appeal of zoning authority be made to a particular state court.

The court finds persuasive the Board's arguments for why a federal court should abstain from involving itself in a locality's land use decisions. Absent special circumstances, this court would not entertain general appeals from a zoning board's judgment. In this case, however, AWS alleges special circumstances.

The explicit statutory language and legislative history of the TCA establish that Congress decided to preempt local zoning authority in a limited manner. Congress passed the Telecommunications Act of 1996 to increase competition in the telecommunications industry. The legislative record clearly reflects Congress' specific intent to establish a "procompetitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced technologies and services to all Americans by opening all telecommunications markets to competition...." *See, e.g.*, Senate Proceedings, 142 Cong.Rec. S686–03 (daily ed. Feb. 1, 1996); H.R.Conf.Rep. No. 104–458, 104th Cong., 2d Sess. 113 (1996). The TCA preserves the decision-making role of local zoning authorities but expressly places limitations, both substantive and procedural, on the power to make zoning decisions regarding wireless towers. Those limitations include requirements that any request to construct a tower must be acted upon within a reasonable period of time, and any denial of such a request shall be in writing supported by substantial evidence in a written record. 47 U.S.C. § 332(c)(7)(B)(iii).

■ Congress has acted to preempt local zoning authority in a limited manner. This case presents a question of federal law in-

---

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof–
 . . . .

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
 . . . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal

wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
 . . . .

(v) Any person adversely affected by any final action ... by a ... local government ... may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis....

47 U.S.C. § 332(c).

volving Congress' efforts to facilitate the expansion of wireless communications. Under such circumstances, abstention is improper. *See Paging, Inc. v. Board of Zoning Appeals for Montgomery County,* 957 F.Supp. 805 (W.D.Va.1997); *accord BellSouth Mobility Inc. v. Gwinnett County,* 944 F.Supp. 923 (N.D.Ga.1996); *Mountain Solutions, Inc. v. State Corp. Comm'n of Kansas,* 966 F.Supp. 1043 (D.Kan.1997).

## II. Procedural Violations

■ The TCA requires that a denial of a request to construct a wireless construction facility be in writing and supported by substantial evidence from a written record. 47 U.S.C. § 332(c)(7)(B)(iii). This requirement enables a reviewing court to ensure that the decision is not arbitrary, is based upon applicable objective standards and policies of the governing body, and that the requirements of the TCA and state law are satisfied. *See Virginia Metronet, Inc. v. Board of Supervisors of James City County, Va.,* 984 F.Supp. 966 (E.D.Va.1998). A one-word, rubber-stamped denial does not facilitate judicial review and does not satisfy the Act's requirements. *See AT&T Wireless PCS, Inc. v. City Council of City of Virginia Beach,* 979 F.Supp. 416, 427 (E.D.Va.1997); *AT & T Wireless Serv. of Fla., Inc. v. Orange County,* 982 F.Supp. 856, 859 (M.D.Fla.1997). The written decision must reflect the reasoning of the deciding body and the evidence upon which it relied. *See Virginia Metronet,* 984 F.Supp. at 972–73. If the decision is to be upheld, it must be on the basis articulated by the deciding body and not on post-hoc, appellate explanations. *See Motor Vehicle Mfr. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

■ The Board's November 6, 1997, one-word, rubber-stamped denial failed the TCA's procedural requirements. The Board argues that the February 1998 decision and the official record [2] satisfy the Act's requirements. The court disagrees. AWS had 30 days from the Board's November 6 decision

to file an appeal under the TCA. 47 U.S.C. § 332(c)(7)(B)(v). The Board issued its written decision on February 20, 1998: 102 days after its initial decision, 77 days after the deadline for filing an appeal had passed and AWS had filed the Complaint in this case, and nine days after the Board filed its Answer after receiving an extension of time.

■ The Board's damage control method of producing written decisions fails TCA's procedural requirements for several reasons. First, an opinion issued months after an appeal has been taken on a previously issued and insufficient decision strongly suggests pretext. Second, to allow such post hoc explanation would force unsuccessful applicants to file suit in order to ascertain whether their applications had been properly considered. Third, the Board's conduct, if condoned, would allow zoning boards to issue rubber stamp rejections, wait for an appeal, and then draft an opinion designed to fit into the cracks of the complaint. Fourth, waiting for a rejected petitioner to appeal before issuing a written decision ignores Congress' requiring a written decision for all rejections. It would be manifestly unfair and violative of Congressional intent to accept the Board's written decision which was issued months into an appeal and after legal consultation. *See Virginia Metronet,* 984 F.Supp. at 973.

■ The court further rejects the Board's argument that the transcript of the November 1997 hearing is a sufficient written decision. *See Western PCS II Corp. v. Extraterritorial Zoning Auth. of Santa Fe,* 957 F.Supp. 1230 (D.N.M.1997). Neither the transcript nor minutes sets forth the factual and legal conclusions upon which a majority of the Board relied in making its determination.[3]

■ The court must yet resolve the merits of AWS's petition. Remanding the case for a proper disposition would have the effect of condoning the Board's method by allowing it to reissue its post hoc explanation, effectively rendering innocuous Congress' procedural requirements. A remand would also violate

---

2. In February, the Board issued an opinion and minutes. Upon Plaintiff's request, the Board produced an audiocassette of the November 1998 hearing, which Plaintiff transcribed.

3. One Board member, David E. Gall, led the argument for rejecting AWS' petition. Mr. Gall stated his factual basis, however, the Board did not adopt Mr. Gall's statements, or any other reasoning, as the basis for its decision.

Congress' requirement for expeditious resolution of TCA disputes.[4] *See* 47 U.S.C. § 332(c)(7)(B)(v). Executing a writ of mandamus would also be improper without inquiring whether issuing a permit would be proper under state and local law. To satisfy the requirements for a timely resolution in compliance with applicable law, and to remedy the Board's procedural violations, the court will conduct a de novo review of the record and of the Board's February explanation. This method allows the court to track the Board's explanation without the deference normally afforded to determinations made in accordance with statutory requirements.[5] No deference is due where, as here, there is a significant likelihood of pretext.

## III. Reviewing the Record

### A. The Evidence

AWS petitioned to construct the 148 foot monopole tower on property owned by the Southeastern Center for Contemporary Art (SECCA). The property's main attraction is the contemporary art center. The center is comprised of the James Hanes House, built in 1932, and a contemporary addition built in the mid–1970's. The SECCA property is located within an IP zoning district. The IP zoning district's purpose is to accommodate public and institutional uses which have limited land use impact or traffic generation upon surrounding property uses. A low density residential neighborhood surrounds the SECCA property. To ease neighbors' concerns about the proposed tower, SECCA agreed not to build any additional towers for 10 years and to include a neighborhood representative on SECCA's board. Members of SECCA's board testified about their support for the tower, the efforts put into making the tower aesthetically pleasing, and the economic benefits of SECCA's lease with AWS.

The SECCA property is 38 acres, primarily wooded. The proposed communication facility would be located in the northwest quadrant. The site surrounding the proposed facility is heavily wooded with trees estimated to be 60 to 85 feet in height and is located approximately 500 feet from the nearest residence. The proposed pole would be 148 feet tall, seven feet wide at the base, with a three foot diameter at the top, gray in color, and without lights. The tower was designed to be as low and concealed as possible in an effort to reduce concern of visibility to surrounding neighbors. No antenna would be visible as it would be entirely within the tower. The tower could house antennae from two additional communication carriers. AWS described the tower as the "stealth" antenna, sleek and unique, designed specifically for the SECCA property. A ten-by-twelve foot equipment base would be located at the base of the tower. The tower would be surrounded by an eight-foot wooden fence landscaped with 54 evergreen plants, shrubs, and four deciduous trees. (See AWS Exs. A–E.)[6]

AWS conducted several neighborhood meetings. To assist the neighbors with evaluating the visibility of the proposed pole, AWS raised a three feet in diameter, orange balloon 148 feet at the proposed pole location. There were only a few instances where the balloon was visible from the surrounding neighborhood. (Aff. of Bonnie Newell accompanying Nov. 6, 1997, Transcript at 15–16.)[7] At the hearing, AWS presented a videotape with an animated tour. The tape

---

**4.** The court distinguishes this case from the circumstances present in *AT & T Wireless Serv. of Fla., Inc. v. Orange County*, 982 F.Supp. 856 (M.D.Fla.1997). In *AT&T Wireless Serv. of Fla., Inc.*, the court was faced with procedural violations and substantial record evidence that the proposed tower violated height and setback requirements. The Board argues that AWS' petition also fails zoning code requirements, however, as discussed below, the record fails to support such contentions.

**5.** The TCA requires that decisions be supported by substantial evidence. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). A de novo review entails reviewing a case for a fresh determination without deference to a prior determination.

**6.** The AWS exhibits are attached to the Affidavit of Bonnie Newell.

**7.** AWS also submitted photocopies of 20 photographs showing the results of the test from various vantage points. (AWS Ex. F.) The results of the test are not discernable from the photocopies.

contained footage of the neighborhoods surrounding the SECCA property, with a computer generated image of the proposed tower. In the majority of views, neighborhood trees shield the tower from view. From a few perspectives, the tip of the tower can be discerned amongst or barely above the treetops. On the tape, the tower's grey color blends well with background clouds. (AWS Ex. G.)

AWS introduced expert witness evidence demonstrating that the proposed communication facility: would not affect public health and safety (AWS Exs. H, I, J); would not substantially impact the value of adjoining property; and would not be inharmonious relative to surrounding land uses but would be one of the least obvious communication facilities in the city. (AWS Ex. L (118–page impact analysis); Tr. 26–38.) An architect who lived in the adjoining neighborhood also testified that the tower would not harm the area's appearance. (Tr. 68.)

AWS submitted the City–County Planning Board's certification that the proposed tower complied with applicable technical requirements. (AWS Ex. K.) An AWS engineer provided an affidavit stating an antenna was needed within a four-tenths-mile diameter area; there were no existing "structures" within the area, requiring a new tower to be built; and the SECCA location has the least amount of impact on the relevant community. Further, the proposed location and height were essential for proper communication. (AWS Ex. N.) If an antenna could not be placed within the area, three antennae would have to be added in surrounding areas to provide adequate coverage.

There was also evidence that existing utilities in the surrounding neighborhood, such as overhead utility lines, were more visible than the proposed facility. (Tr. 42; AWS Ex. G [videotape].) A number of residents close to the proposed site provided letters stating either support for the proposed facility and the revenue it would generate for SECCA or that they were not opposed to the proposed tower. (AWS Ex. M.) AWS then introduced a photograph presentation of visible antennae within communities surrounding the proposed location. (AWS Ex. O.) AWS submitted a signed survey from residents of those communities stating the visible towers had no adverse effect on the character or harmony of their neighborhood. (AWS Ex. P.) Every surveyed resident except one signed the statement. (Tr. 46.)

At the time of the hearing, the 1932 Hanes House was on the study list for the National Register of Historic Places. The State approves whether property is eligible; however, the property owner has the discretion whether to pursue historic registration. AWS provided a December 1995 letter from the North Carolina Department of Cultural Resources stating that a proposed BellSouth tower to be placed adjacent to the modern addition to the Hanes House and near new residential construction would have no effect on the historic structure. (AWS Ex. Q.) AWS' videotape provided a computer generated comparison between the proposed AWS and BellSouth towers as viewed from an adjacent neighborhood. The proposed BellSouth tower exposed its antenna, while AWS' proposed tower was considerably lower and further into the SECCA woods. AWS presented testimony that a historian anticipated the Department of Cultural Resources' approving the tower's construction due to the tower's height and unobtrusiveness.[8] AWS considered the Department's approval a prerequisite to construction. (Tr. 61.)

At the close of AWS' evidence, the Board's chairman called as a witness the City/County Planning Board's historic resource planner for "clarification" purposes. (Tr. 71.) The planner did not profess support for either side. She testified that historic resources, such as the Hanes House, were valuable to the entire community. The "very contemporary addition" to the Hanes House "fit right in" with the "preservation philosophy toward modern additions." (Tr. 75–76.) The planner explained the historic registry process and the general history of the Hanes House. She also stated historicity was a consideration in *Vision 2005*.[9] At one point, the

8. AWS' historian resided out of state and was not present at the hearing. AWS explained it did not anticipate that historicity would be an issue at the hearing.

9. *Vision 2005* is a planning document for Forsyth County prepared by the City/County Planning Board for Forsyth County and adopted by the City of Winston–Salem.

Chairman of the Board suggested expediting the historian's testimony since the history of the Hanes House was not one of the evening's important issues. (Tr. 76.)

Two eloquent spokesmen led the neighborhood opposition to the tower. The neighbors opposed any non-residential encroachment upon their neighborhood and stressed that any structure which would extend above the top of the tree canopy would be out of harmony with their neighborhood. One spokesman was so adamant about the harmony of the neighborhood treetops that he insisted they would oppose a church if its steeple were to protrude above the trees. One of the spokesmen testified that a structure visible above the trees would open a commercial "pandora's box" resulting in fundamental and irrevocable change to the nature of the neighborhood. The neighbors were worried that permitting the tower would "open the door for other such structures." (Tr. 82.) A spokesman described many of the citizens as suffering significant anxiety and anguish; constructing the tower would effect several neighbors' "contentment." (Tr. 87.)

In rebuttal, AWS explained antennae must be elevated above tree level to be operative and effective. AWS also presented testimony that an existing 250–foot–tower with a bright strobe light is visible from SECCA.

The Board then debated the proposal. The members agreed that the proposed tower satisfied the first three requirements for issuing a special use permit. They disagreed on whether the location and character of the tower would be in harmony with its surrounding area, as required by UDO § 6–1.4A(3)(d). A majority of the Board voted to "deny permission to erect the transmission tower—the reason being that insufficient competent evidence [had] been presented that [the tower] is in harmony with the area in which it is to be located and in conformity with *Vision 2005*." (Tr. 134.)

### B. The Board's Post–Appeal Opinion

On February 20, 1998, the Board's secretary issued an opinion. The opinion stated that the tower would: "open the door" for other towers, be visible from the surrounding neighborhood, and be located approximately 148 feet away from the original part of the Hanes House. The opinion also stated that the Hanes House is a historical and cultural resource to the community as a whole, the grounds are an integral part of the SECCA property, and the tower would negatively impact the historic character of the Hanes House and surrounding grounds. The opinion concluded "the proposed tower is not in harmony with the character of the immediately surrounding neighborhood and is not in harmony with the historic character of the Hanes House and surrounding grounds and not in conformity with *Vision 2005 . . . .*" (Aff. Aubrey Smith, Ex. B.) Only the secretary signed the opinion with a statement that the Board adopted the opinion on February 5, 1998.

### C. Analysis

The UDO permits transmission towers within IP zoning subject to the acquisition of a special use permit. The Board shall issue a special use permit only if it can make the following affirmative findings:

(a) That the use will not materially endanger the public health or safety if located where proposed and developed according to the application and plan as submitted and approved;

(b) That the use meets all required conditions and specifications;

(c) That the use will not substantially injure the value of adjoining or abutting property, or that the use is a public necessity; and,

(d) That the location and character of the use, if developed according to the application and plan submitted and approved, will be in harmony with the area in which it is to be located and in general conformity with *Vision 2005*.

UDO § 6–1.4A(3).

█ In North Carolina, conditional use permits [10] are issued upon a showing that the applicable ordinance's requirements will be

---

10. In their briefs, the parties treat "special use" as synonymous with "conditional use." The UDO § 2–4.5(C) states, "Uses identified [as requiring a Board of Adjustment special use permit] shall be permitted in such district upon approval . . . with such conditions as referenced in the *Conditions* column. . . ."

satisfied. *Woodhouse v. Board of Commissioners of Nags Head,* 299 N.C. 211, 215, 261 S.E.2d 882, 886 (1980). "Where an applicant for a conditional use permit produces 'competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of a special use permit, *prima facie* he is entitled to it.'" *Id.* at 216, 261 S.E.2d at 886 (citation omitted). Due to the overwhelming weight of the evidence, the court agrees with the Board's finding that AWS satisfied the first three requirements under UDO § 6–1.4A(3). The Board claims AWS' petition fails the fourth element of harmony.

■■■ Under North Carolina zoning law, a "conditional use" is deemed to be "in accord with the purpose and intent of the ordinance." *Woodhouse,* 299 N.C. at 216, 261 S.E.2d at 886. "The inclusion of the particular use in the ordinance as one which is permitted under certain conditions, is equivalent to a legislative finding that the prescribed use is one which is in harmony with the other uses permitted in the district." *Id.* (citation omitted). "The inclusion of a use as a conditional use in a particular zoning district establishes a prima facie case that the permitted use is in harmony with the general zoning plan." *Vulcan Materials Co. v. Guilford County Bd. of County Commissioners,* 115 N.C.App. 319, 324, 444 S.E.2d 639, 643 (1994).

■■■ A zoning board sits in a quasi-judicial, rather than a legislative, capacity. *Sherrill v. Wrightsville Beach,* 81 N.C.App. 369, 373, 344 S.E.2d 357 (1986). "A board of commissioners 'cannot deny applicants a permit in their unguided discretion or, stated differently, refuse it solely because, in their view, [it] would adversely affect the public interest.'" *Woodhouse,* 299 N.C. at 217, 261 S.E.2d at 886 (citation omitted).

The court's initial concern is the disparity between the written opinion and what occurred at the hearing. At the hearing, the Board rejected AWS' petition because "insufficient competent evidence [had] been presented that [the tower] is in harmony with the area." (Tr. 134.) The February opinion states the tower is not in harmony with the surrounding neighborhood and is not in har-

mony with the historic character of the Hanes House. The February opinion does not represent what the Board discussed and voted on during the November hearing. The February opinion is not signed by any Board members, let alone a majority. The court's concern is, however, mooted since both the November and February explanations fail.

### 1. November's Explanation

■■■ The UDO Table 2.6 lists transmission towers as a permitted use on IP property. Under North Carolina law, the UDO's inclusion establishes a prima facie case of harmony. AWS began the hearing with a legislative presumption that its tower was in harmony with the surrounding area. The Board erred by deciding AWS failed to present sufficient evidence. The burden was on the opponents to rebut the presumption of harmony.

### 2. February's Explanation

■■■ February's explanation abandons the claim that AWS failed to present sufficient evidence, concluding instead that the evidence demonstrated the tower's disharmony both with the surrounding neighborhood and the Hanes House. Nearly all the evidence offered in opposition to AWS' petition was based upon neighbors' testimony that the proposed tower would be inharmonious with their neighborhood because it would be visible above the trees. The February explanation adopts this visibility argument. Such reasoning must fail.

The Board performs a judicial, not legislative, function. The legislative body determined transmission towers were a permissible use on the SECCA property. The legislature presumably intended *visible* towers. The Board was to determine whether AWS' proposed tower should be permitted, not whether any tower would be permissible. By excluding visible towers, the Board usurped the role of the legislature. The court finds that the preponderance of credible and substantial record evidence demonstrates AWS' proposed transmission tower would be in harmony with the surrounding area.

Regarding historical impact, nothing in the record or the February decision explains how a gray pole in the woods affects the historicity of a building being used as a *contemporary* art center, with a "very contemporary" addition *attached* to the aged structure. Similarly, there is no explanation how the pole affects historicity when the appropriate state agency found that a larger, exposed antenna placed on the SECCA property would have no impact on the area's historical worth. For that matter, the Board did not discuss or vote upon any historical matters in November, which is not surprising since the court finds absolutely no record evidence that AWS' proposed tower would negatively impact the historical worth of the SECCA property. There being no evidence, discussion, or vote, the court finds the explanation without merit.[11] Similarly, there is no record evidence on how AWS' proposed tower violates *Vision 2005*.

## IV. Conclusion

The Board violated the TCA's procedural requirements. The decision upon which a majority of the Board voted in November is not the same decision the Board issued in the midst of litigation. Regardless, the court rejects the Board's arguments and finds the weight of record evidence supports AWS' petition. The court will enter an order granting Plaintiff's motions and issuing a Writ of Mandamus directing the Board to grant AWS' petition for a special use permit.

*JUDGMENT and WRIT OF MANDAMUS*

The court denies The Winston–Salem Zoning Board of Adjustment's Motion to Dismiss for Lack of Subject Matter Jurisdiction, as set forth in the Answer, for failure to comply with Local Rule 7.3(a), MDNC [Pleading No. 5].

For the reasons set forth in the memorandum opinion filed contemporaneously herewith, the court grants AT & T Wireless PCS, Inc.'s motion for summary judgment [7] and denies The Winston–Salem Zoning Board of Adjustment's motions to dismiss [10] and for summary judgment [20].

The court further orders The Winston–Salem Zoning Board of Adjustment to grant the November 6, 1997, Application of the Southeastern Center for Contemporary Art and AT & T Wireless PCS, Inc. for a Special Use Permit and issue a special use permit for the same before July 1, 1998.

---

**11.** The Board provides no clarification why the historical explanation materialized in February. The only relevant event, of which this court is aware, between the November hearing and February explanation, was a January letter from the North Carolina Department of Cultural Resources stating that, pursuant to the National Historic Preservation Act and 36 C.F.R. Part 800, AWS's proposed tower, as planned, would not affect the SECCA property.