**PRIMECO PERSONAL COMMUNICATIONS, L.P., Plaintiff,**

v.

**VILLAGE OF FOX LAKE, Defendant.**

**No. 97 C 8023.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 19, 1998.

---

Donald Joseph Vogel, Sara Lynne Thomas, Adam Carl Smedstad, Michael, Best & Friedrich, Chicago, IL, for Plaintiff.

Paul P. Phillips, Howard R. Teegen, Soffietti, Johnson, Teegen, Phillips & Schwartz, Ltd., Fox Lake, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

PrimeCo Personal Communications, L.P., filed this lawsuit under 47 U.S.C. § 332(c)(7)(B)(v), alleging that the Village of Fox Lake violated § 704 of the Telecommunications Act of 1996, codified at 47 U.S.C. § 332(c)(7), when it denied PrimeCo's application for a special use permit authorizing the construction of a wireless communications monopole on property located in the Village. Specifically, PrimeCo claims that the Village failed to provide a written decision denying the application and that the denial was not supported by substantial evidence contained in the written record as required by § 332(c)(7)(B)(iii). What constitutes a sufficient written decision and substantial evidence under the Telecommunications Act is a question of first impression in this district and this circuit. In fact, in Illinois, only the United States District Court for the Central District of Illinois and the Appellate Court of Illinois for the Fifth District have addressed these issues. *See Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732 (C.D.Ill.1997); *C-Call Corp. v. Zoning Bd. of Appeals of Edwardsville*, 298 Ill.App.3d 1128, 233 Ill.Dec. 136, 700 N.E.2d 441 (Ill.App. 5 Dist. 1998).

The parties have filed cross-motions for summary judgment. Because PrimeCo and the Village do not dispute the relevant facts, instead arguing the legal import of those facts, the case is ripe for resolution. After careful consideration, this Court grants judgment in favor of PrimeCo, and remands the case to the Village Trustees for an expedited hearing on PrimeCo's application.

## FACTS

Wireless communications are accomplished by sending low-power radio signals among cellular towers, generally situated in a honeycomb configuration. If the distance between cellular towers is too great, then "coverage gaps" occur. Coverage gaps significantly impair wireless service not only for people in the immediate area of the gap, but also for other customers because existing towers must then handle the "overflow" by relaying signals that should be—according to the honeycomb grid—transmitted via a non-existent tower. Additionally, in the coverage-gap area customers can neither initiate nor receive cellular telephone calls, and when customers travel through a gap area their calls are disconnected. Within each honeycomb (or coverage area) there is a "pinpoint area" in which the communications tower and radio antenna must be located to eradicate a coverage gap.[1]

PrimeCo has a coverage gap in the Village and thus cannot provide wireless services to residents of the Village or to customers traveling through the Village. In November 1996, PrimeCo identified the pinpoint area of the Village in which it was essential to locate a communications tower. After locating a technically feasible site within the pinpoint area, PrimeCo signed a five-year lease with its owner, Michael Hellios, to construct and place a communications tower and equipment shelter on a 30–foot by 30–foot area of the land.[2] The Hellios site is a three-and-a-half acre lot that contains a construction company and heavy machinery. (Village App.Ex. 1, Zoning Bd. of Appeals July 24, 1997 Minutes at 2 ("July Minutes"); *Id.* Ex. 11, Zoning Bd. of Appeals March 27, 1997 Minutes at 1 ("March Minutes").)

In Illinois, local units of government are in one of two categories: home-rule units or non-home-rule units. The Village of Fox Lake is a home-rule unit, which simply means that the Village is empowered to regulate local affairs, including the use of property within the Village.

The record does not reveal what zoning category the Hellios site occupies, but all

---

[1] For a comprehensive discussion of wireless communications technology and the practical demands of implementing wireless communications services, see Gregory Tan, Comment, *Wading Through the Rhetoric of the Telecommunications Act of 1996: Uncertainty of Local Zoning Authority Over Wireless Telecommunications Tower Siting*, 22 Vt.L.Rev. 461, 467–77 (1997).

[2] The record does not contain a copy of the lease agreement between PrimeCo and Mr. Hellios.

agree that before building the monopole and equipment shed PrimeCo was required to obtain a special use permit. The procedure for obtaining a permit involves applying to the Planning and Zoning Board of Appeals ("Zoning Board" or "Board"), which makes a recommendation to the Village Board of Trustees ("Village Trustees" or "Trustees"). Village Ordinance 9–1–6–10D sets forth the standards used by the Zoning Board in forming its recommendation:

Standards: No special use shall be recommended by the [Zoning Board] unless they [sic] shall find:

1. That the establishment, maintenance or operation of the special use will not be detrimental to or endanger the public health, safety, morals, comfort or general welfare.

2. That the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity ..., nor substantially diminish and impair property values within the neighborhood.

3. That the establishment of the special use will not impede the normal and orderly development and improvement of the surrounding property....

4. That adequate utilities, access roads, drainage and/or necessary facilities have been or are being provided.

5. That adequate measures have been or will be taken ... to minimize traffic congestion in the public streets.

6. That the special use shall, in all other respects, conform to the applicable regulations of the district in which it is located....

The ordinance instructs the Zoning Board to make written findings of fact to submit with its recommendation. The Village Board of Trustees, however, "may grant or deny any application for a special use permit after receiving the report of the ... Zoning Board." Ord. 9–1–6–10 (second to last unnumbered paragraph).[3]

In February 1997, PrimeCo filed its application for a special use permit with the Village's Zoning Board.[4] During a hearing before the Zoning Board on March 27, 1997, Irwin Leiter represented PrimeCo. Leiter first described the project: a 150–foot monopole and an eight by ten by twelve foot equipment shelter. He reported that the monopole met all FCC requirements, would withstand hurricane-force winds, and would be surrounded by a six-foot fence. He also explained that other utilities and emergency service providers could "piggyback" on the tower, but that additional antennae would be required.

In response to questions from board members, Leiter described the monopole as being less than six feet around, either grey or white, and constructed from aluminum or spun concrete. Finally, he told the Board that even if the current cellular technology became obsolete, a new tower would not be necessary because PrimeCo could simply update the equipment, which would all be located in the shed on-site. The Board voted to recommend approving the special use application. (March Minutes at 1–3.)

Apparently PrimeCo failed to properly notify all adjacent landowners and was therefore forced to submit a second special use application, which it did on June 23, 1997.[5] The first hearing on the second application occurred on July 24. Leiter reviewed the information he provided during the March hearing. He also reported that the tower was needed for continuous service in the area, that current PrimeCo customers' phone calls were cut off when they drove through the Village, and that the tower would be located 500 feet away from the nearest residence and 20 feet back from the frontage road. A board member noted that the tower would be "invisible from the north because of topography." (July Minutes at 1.)

Several area residents voiced concerns during the July hearing. Alan Sturgess worried about the tower falling down, while Mary Battle was concerned about the danger to small aircraft and the ugliness of a light floating 150 feet up in the air. Ron Richards

---

3. The record does not contain any other part of the Village Ordinance. Therefore, we do not know if the Village Trustees are constrained to consider certain factors when voting to grant or deny a special use permit.

4. The record does not contain a copy of PrimeCo's February 1997 application.

5. The record does not contain a copy of PrimeCo's second application either.

asked whether "this [is] the first thing that we want people to see as they enter Fox Lake." (July Minutes at 2.) Richards also claimed that the tower would impact residents' electronic equipment and the area wildlife. Finally, Richards opined that PrimeCo's antenna could be attached to an existing water tower. A board member reported that several residents complained about the tower being in their view, and another board member commented that he could see no benefit to the Village. A motion to approve the special use application "die[d] for lack of a second," (July Minutes at 3), and the hearing was continued until August 13.

Several PrimeCo witnesses attended the August 13 hearing to address the concerns raised by residents at the July hearing. (Village App.Ex. 2, Zoning Bd. of Appeals Aug. 13, 1997 Minutes at 1 ("August Minutes").) Shellie Ruiz [6] explained that PrimeCo chose the Hellios site because it had the best zoning, "business zoning", and that if the Hellios site was unavailable PrimeCo would need to construct two or more communications towers. In response to a board member's question, Ruiz testified that existing water towers were unacceptable because they were not located within the pinpoint area, which was between one-quarter and one-half of a mile wide. She also stated that another proposed site was inappropriate because it was too close to a PrimeCo tower located in Volo, Illinois.

Michelle Krezek explained how PrimeCo and the Hellios site satisfied the six special use criteria outlined in section 9–1–6–10D of the Village Ordinance. She stated that PrimeCo abides by all FCC guidelines, and that no noise, light, or vibrations would be generated by the communications tower. Additionally, Krezek explained that the facility would not interfere with any other radio transmissions because all PrimeCo signals would be on a specific band. She stated that subsections four and five, relating to traffic and "support systems" (e.g., water, drainage, roads, utilities, etc.), were essentially inapplicable because the tower did not need any

supports other than those already existing and would increase traffic by exactly one maintenance vehicle per month.

The final prepared statement was given by Ted Kowalski, an independent real estate appraiser. He testified that, in general, communications towers did not have an adverse effect on surrounding property values, and read a report to that effect.[7] He had not, however, conducted an appraisal of the properties at issue.

The August Minutes reflect that Bridget Brennon "spoke on the benefits of the site," but do not transcribe anything she actually said. Additionally, unidentified PrimeCo witnesses stated that all setback requirements would be met, that the tower would not have a warning light because the FAA ruled that none was needed, and that the tower would be 30 feet away from the nearest gas tank. Finally, two residents commented on the proposed special use: Ron Richards repeated that the Village would derive no economic benefit from the tower, and James Green stated that the tower would be obsolete within ten years and wondered whether PrimeCo would then remove the tower. The August Minutes do not report a response to Green's question. The Board then voted to recommend approving PrimeCo's special use application.

The Village Trustees took up the issue of PrimeCo's application at their October 20 board meeting, and denied it. (Village App. Ex. 9, Village Board of Trustees October 20, 1997 Minutes at 4 ("Trustee Minutes").) PrimeCo's application receives two mentions in the Trustee Minutes. First, the application is described:

ITEM KK: A MOTION TO ACCEPT ORDINANCE 97–47 AMENDING THE ZONING ORDINANCE OF THE VILLAGE BY GRANTING A SPECIAL USE TO OCS PRIMECO[,] A CORPORATION[,] TO ALLOW THE CONSTRUCTION OF A CELLULAR TELEPHONE TOWER & EQUIPMENT CABINET ON THE PROPERTY COMMONLY DESIGNATED AS 855 RAND ROAD.

6. The August Minutes spelled this name "Shelly Rouis"; however, a copy of an internal PrimeCo e-mail shows her name as "Shellie Ruiz." We assume the e-mail contains the correct spelling of her name.

7. The August Minutes do not reflect the name or source of the report Mr. Kowalski read, nor does the record contain a copy.

(Trustee Minutes at 3 (emphasis in original).) Second, the application is denied:

> TRUSTEE HUNTER SAID HE WANTED TO REMOVE ITEM KK FOR THE FOLLOWING REASONS: BECAUSE OF THE LACK OF COMMUNICATION WITH THE CURRENT BOARD AND PRIMECO TO INVESTIGATE "A MUTUALLY VISIUAL [sic] IMPACTING SITE;" A LETTER RECEIVED 10/6/97 BY PRIMECO STATED THAT "PRIMECO IS COMMITED [sic] TO SECURING SITES THAT HAVE MINIMUAL [sic] VISUAL IMPACT ON AN AREA, AND IS EAGER TO PROVIDE SERVICES TO THE RESIDENTS AND BUSINESS [sic] IN AND AROUND FOX LAKE"; IN THE MINUTES OF THE HEARING OF THE SPECIAL USE PERMIT FOR 855 RAND ROAD PRIMECO'S LEGAL CONSOLE [sic] STATES THAT "THE BENEFIT TO THE COMMUNITY WOULD BE THAT TOURIST'S [sic] COULD USE THEIR PHONES IN THE VILLAGE".
>
> TRUSTEE HUNTER MADE A MOTION TO DENY THE PERMIT AT 855 S. RAND ROAD, SECOND BY TRUSTEE ERDMAN.
>
> AYES: ALL
>
> NAYS: NONE
>
> MOTION CARRIED.

(Trustee Minutes at 4 (unmatched quotation mark, ambiguity, and odd punctuation in the original).) The Trustee Minutes contain no indication that any evidence was taken; that the minutes of the hearings before the Zoning Board were reviewed by the Trustees; or

that residents, PrimeCo personnel, or any Trustee other than Hunter made statements before the Trustees voted to deny the special use permit.

At the end of the meeting, during the "Audience Comment" portion of the meeting, Trudy Hellios complained that the Zoning Board, after many months of hearings, had voted to approve the permit. The Village attorney, Mr. Johnson, responded that the Zoning Board's recommendation was not binding on the Trustees, and that he was currently working on a special "cellular tower ordinance".

In its motion for summary judgment, PrimeCo argues that it never received a written denial and that the Trustee Minutes do not constitute a written denial as a matter of law. Furthermore, argues PrimeCo, the record contains no evidence, much less substantial evidence, supporting the Village's decision to deny the special use permit.[8] The Village responds and also seeks summary judgment on the ground that the Trustee Minutes constitute a sufficient written response and that substantial evidence gathered during the Zoning Board hearings supports the denial.[9]

## THE TELECOMMUNICATIONS ACT

Section 332(c)(7)(B)(iii) provides that

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the written record.

This case presents two basic questions of statutory interpretation, both issues of first impression:[10] what constitutes a sufficient

---

**8.** Originally, PrimeCo also argued that the denial had "the effect of prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). It appears, however, that PrimeCo has abandoned this claim. In any event, the claim is meritless. We agree with the Fourth Circuit that subsection (B)(i)(II) refers to general statutory provisions; not case-by-case decisions to deny zoning variances. *See AT & T Wireless PCS, Inc. v. City Council of Virginia Beach,* 155 F.3d 423, 428 (4th Cir.1998) (subsection (B)(i)(II) "only applies to blanket prohibitions and general bans or policies, not to individual zoning decisions." (quotation omitted)); *Sprint Spectrum L.P. v. Town of North Stonington,* 12 F.Supp.2d 247, 256 (D.Conn.1998) (same); *Cellco Partnership v. Town Plan and Zon-*

*ing Comm'n of Farmington,* 3 F.Supp.2d 178, 184–85 (D.Conn.1998). Even if subsection (B)(i)(II) has a broader reach, PrimeCo has submitted no evidence whatsoever that the Village's denial of this one application for a special use permit had the effect of prohibiting wireless service provision.

**9.** PrimeCo filed a motion to strike the Village's cross-motion for summary judgment, which this Court denied in open court on November 10, 1998, after the parties confirmed that no factual dispute exists.

**10.** As stated in the introduction, courts in the Northern District of Illinois and the Seventh Circuit have yet to interpret § 332(c)(7)(B)(iii); in

"writing", and what constitutes "substantial evidence" under § 332(c)(7)(B)(iii). The Act does not provide definitions or any other clarifying language regarding these two terms, nor do we believe the meaning of "writing" or "substantial evidence" is clear in the context of state zoning regulation. *Compare AT&T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment,* 11 F.Supp.2d 760, 764 (M.D.N.C.1998) ("writing" under subsection (B)(iii) requires a statement of reasons for denying the special use), *and APT Minneapolis, Inc. v. City of Maplewood,* 1998 WL 634224, at *5 (D.Minn. Aug.12, 1998) (vague assertions by residents that a communications tower would be aesthetically displeasing does not constitute "substantial evidence"), *with Virginia Beach,* 155 F.3d at 430 (a written denial need not include a statement of factual findings or reasoning), *and id.* at 431 (generalized concerns voiced by constituents constitute "substantial evidence").[11]

To answer these two questions, we will briefly review the history of the Act and survey the case law interpreting subsection (B)(iii). In this case, the question is whether the poorly transcribed minutes of the Trustees' meeting constitutes a writing; the specific evidentiary issue is whether concerns voiced by constituents with no supporting evidence during zoning board hearings constitute substantial evidence. Therefore, we focus on aspects of the legislative history and case law useful to these issues.

## I. History of § 704 of the Telecommunications Act of 1996

The Telecommunications Act was enacted "to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies." 142 Cong.Rec. H1078 (daily ed. Jan. 31, 1996) (H.R.Conf.Rep.104–458). Congress describes the purpose of the Act in the preamble: "[T]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56.

Originally, Congress sought to achieve its deregulatory goal by creating a commission comprised of people representing local governments, public safety agencies, and affected industries to develop a nation-wide uniform policy for the siting of wireless communication towers. 141 Cong. Rec. H9954 (daily ed. Oct. 12, 1995) (Reading S.652, Telecommunications Competition and Deregulation Act of 1995, at § 108 Facilities Siting). After opposition to this proposal developed, conference staff recommended eliminating the negotiated-rulemaking commission and clarifying that local governments retain "authority to determine placement of [cellular towers] but must do so in a reasonable and non-discriminatory manner." Telecommunications Conf. Staff Recommendations for Res. of Issues on Pub.L. 104–104, at ¶ 28, Cellular Facilities Siting (Dec. 6, 1995). Congress adopted the staff recommendation and enacted § 704 of the Act, codified at 47 U.S.C. § 332(c)(7).

Section 704(a), or statutory section 332(c)(7), is titled "Preservation of local zoning authority". Subsection (c)(7)(A) announces, "[e]xcept as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." Subsection (c)(7)(B) provides the limitations referred to in subsection (c)(7)(A); the limitations are both procedural and substantive.

The substantive limitations on local authority decree that zoning regulations "shall not unreasonably discriminate among providers" and "shall not prohibit ... the provision of personal wireless services."

---

Illinois, only the District Court for the Central District of Illinois and the state appellate court for the Fifth District have addressed the questions presented by this case.

**11.** For ease of citation, this Court will use the town, village or borough name in short cites, and will refer to the relevant statutory provisions using "subsection" even when discussing sub-sub-subsection (B)(iii).

§§ 332(c)(7)(B)(i)(I) & (II). The statute also outlaws governmental consideration of "the environmental effect of radio frequency emissions," so long as the emissions comply with FCC regulations. § 332(c)(7)(B)(iv).

Procedurally, the Act requires local governments to act expeditiously on requests for zoning variances, § 332(c)(7)(B)(ii), and requires zoning denials to be in writing and based on substantial evidence, § 332(c)(7)(B)(iii). Finally, subsection (c)(7)(B)(v) provides jurisdiction to federal courts over controversies arising under § 332. Although Congress explained at length subsections (c)(7)(B)(i), (ii), (iv), and (v), it devoted only one sentence to subsection (B)(iii): "The phrase 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions." 142 Cong.Rec. H1078, at § 704 (H.R.Conf.Rep.104–458).

## II. Review of the Case Law Interpreting the Telecommunications Act

In the roughly two and a half years since the Act became law, only one federal appellate court has interpreted subsection (B)(iii), *Virginia Beach*, 155 F.3d 423 (4th Cir.1998); several federal district and state courts have done so. *See, e.g., Cellular Tel. Co. v. Zoning Board of Ho–Ho–Kus*, 24 F.Supp.2d 359 (D.N.J.1998); *AT&T Wireless Serv. of Fla. v. Orange County*, 23 F.Supp.2d 1355 (M.D.Fla. 1998); *AT&T Wireless PCS, Inc. v. City of Chamblee*, 10 F.Supp.2d 1326 (N.D.Ga.1997); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732 (C.D.Ill.1997); *Smart SMR of N.Y., Inc. v. Fair Lawn Board of Adjustment*, 152 N.J. 309, 704 A.2d 1271 (N.J.1998); *Sprint Spectrum, L.P. v. Zoning Board of Guilderland*, 173 Misc.2d 874, 662 N.Y.S.2d 717 (N.Y.Sup.Ct.1997). Having reviewed these and other decisions analyzing the Act, we apprehend two general trends of interpretation: one trend dictates rigorous review of local zoning decisions, and the other grants substantial deference to such decisions.

The rigorous-review trend, represented by a majority of district court decisions, reads subsection (B)(iii) as imposing broad limitations on zoning boards. For example, these courts interpret "writing" to require a written statement of factual findings and the zoning board's reason for denying a special use permit. *See, e.g., Winston–Salem*, 11 F.Supp.2d at 764 ("A one-word, rubber-stamped denial does not ... satisfy the Act's requirements.... The written decision must reflect the reasoning of the deciding body and the evidence upon which it relied."). One court, relying on a social security case, requires that "all evidence must have been considered by the Board, adequate explanations for rejecting relevant evidence must have been provided, and the Board's decision must have been 'accompanied by a clear and satisfactory explication of the basis on which it rests.'" *Ho–Ho–Kus*, 24 F.Supp.2d 359, 366, 1998 WL 758684 (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981)). These courts clearly envision an opinion-style writing issuing whenever local authorities deny special use applications.

Although the Act in no way intimates an opinion-style writing requirement, the rigorous-review courts reason that "the purpose of [the writing] requirement is to facilitate review and to assure that decisions are not made arbitrarily and without sufficient justification." *Ho–Ho–Kus*, 24 F.Supp.2d 359, 1998 WL 758684, at *5; *see also Winston–Salem*, 11 F.Supp.2d at 764 ("This requirement enables a reviewing court to ensure that the decision is not arbitrary, is based upon applicable objective standards and policies of the governing body, and that the requirements of the [Act] and state law are satisfied."); *Illinois RSA No. 3*, 963 F.Supp. at 743 ("Decisionmaking must make written findings and conclusions so that reviewing bodies may efficiently judge those findings and conclusions against the evidence and the record."); *Western PCS II Corp. v. Extraterritorial Zoning Auth.*, 957 F.Supp. 1230, 1235–36 (D.N.M.1997). Essentially, these courts reason backwards; they argue that substantial evidence review would be impossible—or at least exceedingly difficult—absent an opinion-style writing denying special use applications.

Rigorous-review courts also read the "substantial evidence" requirement as significantly modifying the factors local authorities can legitimately consider in cellular zoning cases. Before the Act, federal courts agreed that

zoning decisions could be based on political considerations and subjective concerns. *See, e.g., Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir.1988) ("[N]othing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition."). Thus, denying a special use permit for the purpose of protecting existing businesses against competition, *see id.,* or because constituents prefer a golf course to a subdivision, *see River Park, Inc. v. City of Highland Park,* 23 F.3d 164, 165 (7th Cir.1994), or because residents simply did not want a McDonald's in their neighborhood, *see Pearson,* 961 F.2d at 1214, was completely legitimate and unreviewable in federal court, even if the zoning authority violated state law in making its determination. *See River Park,* 23 F.3d at 166–67 ("Failure to implement state law violates that state law, not the Constitution; the remedy lies in state court.").

Now, however, the rigorous-review courts believe the Act limits zoning-board consideration to demonstrable facts, actual "evidence" as that term is used in judicial and quasi-judicial agency proceedings. Thus, several courts have held that constituent "testimony" at zoning hearings does not constitute substantial evidence. For example, in *Illinois RSA No. 3,* the court evaluated such evidence as follows:

> The opposing evidence consisted of local property owners' objections based on health concerns, fears about diminished property values, and generalized concern that Plaintiff had not adequately investigated alternate sites. Under scrutiny, none of this evidence amounts to more than a scintilla of support for the County's final decision.

963 F.Supp. at 744; *See also Chamblee,* 10 F.Supp.2d at 1331–32 (resident's unsupported testimony that Tower would be an "obnoxious condition" does not satisfy substantial evidence test); *BellSouth Mobility Inc. v. Gwinnett County.,* 944 F.Supp. 923, 928 (N.D.Ga.1996) (testimony by neighborhood representative that the cellular tower would (1) pose a threat to neighborhood children, (2) be visible from the front window of 20 houses in the neighborhood, and (3) not be aesthetically compatible with existing land use does not constitute substantial evidence). These courts in effect read a substantive limitation into subsection (B)(iii): local authorities may no longer take into consideration the subjective fears and complaints of their constituents when deciding cellular special use cases.

The second or deferential trend, represented by the Fourth Circuit decision and a small number of other court decisions, reads subsection (B)(iii) more narrowly. These courts believe that, because Congress did not modify "writing" in any way, the Act requires nothing more than the written statement "special use permit denied." *See Virginia Beach,* 155 F.3d at 429 (letter with description of the special use application with "Denied" and the date written across the top satisfies the "writing" requirement); *Stonington,* 12 F.Supp.2d at 251–52 (written decision adopting legal advise contained in letter that was part of the record was sufficient under the Act); *Gearon & Co. v. Fulton County, Ga.,* 5 F.Supp.2d 1351, 1354 (N.D.Ga.1998) (a simple written statement denying the special use application is sufficient under subsection (B)(iii)). The Fourth Circuit commented that the district court improperly "imported additional language into the statute" when it required something more. *Virginia Beach,* 155 F.3d at 429. That appellate court also explained that the writing requirement and the substantial evidence requirement are entirely separate, and only the substantial evidence requirement imports the federal administrative law standard. *Id.*

More importantly, the deferential-review courts believe that subsection (B)(iii) in no way limits or changes the factors considered by local authorities in determining zoning cases. *See, e.g., Orange County,* 23 F.Supp.2d 1355, 1358 ("[S]o long as a local authority has not acted to ban cellular service, the Telecommunications Act does not change the substantive land use controls enforceable by local governments."); *Sprint Spectrum L.P. v. Willoth,* 996 F.Supp. 253, 257 (W.D.N.Y.1998) ("By enacting the Telecommunications Act, Congress did not intend to pre-empt the authority of state and local governments to regulate the location of cell towers within their communities."). These

courts, of course, recognize that other § 332(c)(7)(B) subsections impose substantive limitations on local authorities; they simply believe that the terms of subsection (B)(iii) do not impose any substantive limitations, or even any very stringent procedural limitations. They appear to view the substantial evidence requirement as similar to the "invidious or irrational" test used to review due process challenges to zoning decisions. *See, e.g., Coniston Corp.*, 844 F.2d at 467–68. In support of this position, the *Virginia Beach* Court explained,

> The Virginia Beach City Council is a state legislative body, not a federal administrative agency. The "reasonable mind" of a legislator is not necessarily the same as the "reasonable mind" of a bureaucrat, and one should keep the distinction in mind when attempting to impose the "substantial evidence" standard onto the world of legislative decisions. It is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters. These views, if widely shared, will often trump those of bureaucrats or experts in the minds of reasonable legislators.

155 F.3d at 430. As is obvious from this quote, the Fourth Circuit (and other courts following this trend) believe that even unsupported testimony of constituents against special use applications constitutes substantial evidence.

Having completed our review of the legislative history and case law interpreting subsection (B)(iii) of the Act, we turn to our case.

## ANALYSIS

When presented with a question of first impression, this Court's task is to predict how the Seventh Circuit would rule on the issue. In addition to the overview of the Telecommunications Act, we are guided by pre-Act cases analyzing zoning and administrative law. For the reasons explained below, this Court concludes that the Act's writing requirement demands nothing more than written notification of a denial. With regard to the substantial evidence requirement, the correct standard for evaluating decisions made by local zoning authorities under the Act is a hybrid of the two trends outlined above, a sort of "probing deferential review". Applying these standards, we hold that the Trustee Minutes constitutes a writing under the Act, but that the Village's denial of PrimeCo's special use application was not supported by substantial evidence.

## I. The Writing Requirement

■ We hold that, under subsection (B)(iii), the written denial of a special use application need only notify the applicant of the local government's decision denying the application. We agree with the reasoning of those courts that have reached this conclusion; namely, that the Act does not explicitly require anything more, such as express factual findings or the reasons for the denial. As stated by the Fourth Circuit, "[t]he simple requirement of a 'decision .. in writing' cannot reasonably be inflated into a requirement of a 'statement of ... findings and conclusions, and the reasons or basis therefor.'" *Virginia Beach*, 155 F.3d at 430.

■ Given the already radical intrusion into an area traditionally considered the almost-exclusive domain of local authorities, had Congress intended to impose the additional burden of producing an opinion-like writing on state and local entities, it would have said so—if not in the statute, then certainly in the conference report. *See, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("Congress may legislate in areas traditionally regulated by the States. This is an extraordinary power in a federalist system. It is a power we must assume Congress does not exercise lightly."); *id.* at 470, 111 S.Ct. 2395 ("In the face of ... ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions."); *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 16, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent."); *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 780, 67 S.Ct. 1026, 91

L.Ed. 1234 (1947) ("Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses."). Clearly, Congress knows how to define terms by reference to other statutes and areas of law: when discussing the same subsection it defined "substantial evidence" by reference to administrative law. Congress did not, however, import the rather extensive written requirements contained in the Administrative Procedure Act, 5 U.S.C. § 557(c), to define "writing" under subsection (B)(iii) of the Telecommunications Act.[12] *See Pennhurst,* 451 U.S. at 25, 101 S.Ct. 1531 ("[A] brief comparison of the general language of [the statutory provision] with the conditions Congress explicitly imposed on the States [elsewhere in the statute] demonstrates that Congress did not intend to place either absolute of conditional obligations on the States."); *cf. Bread Pol. Action Comm. v. FEC,* 455 U.S. 577, 583, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982) (rejecting an expansive reading of a standing provision because "the structure of the Act suggests that Congress knew how to specify [expansive standing], and therefore could as easily have directed that 'any' person might invoke the unique procedures of § 437h."). For these reasons we refuse to read subsection (B)(iii) as requiring anything more than a written statement informing the applicant that its application has been denied. We find that the Trustee Minutes satisfy the subsection (B)(iii) writing requirement.

We recognize that several states have imposed the burden of producing an opinion-style writing on local zoning authorities. In fact, the Village Ordinance in this case requires the Zoning Board to submit written factual determinations to the Trustees.[13] But, given the comity interests implicated under these circumstances, we will not impute to Congress the intent to impose more of a burden than that expressly dictated by the Act.

Having said this, local authorities would be well-advised to explain fully their reasons for denying special use applications for cellular towers, either in written form or during fully transcribed proceedings. All agree that the Telecommunications Act imposes new substantive limitations on local zoning decisions (whether or not they agree that subsection (B)(iii) does so) and it would be foolhardy to rely on the goodwill of federal courts to ferret through state administrative records in search of substantial evidence that these limitations have not been violated. Furthermore, well-written zoning decisions would not only aid judicial resolution of these cases but might also pre-empt legal challenges under the Act. See, e.g., *Ho–Ho–Kus,* 24 F.Supp.2d 359, 360 (zoning authority issued 36–page resolution memorializing factual findings and reasons for denying special use application; denial supporting by substantial evidence); *Orange County,* 23 F.Supp.2d 1355, 1358 (the district court ordered the zoning authority to supplement the record with written findings of fact; denial of special use permit upheld); *Willoth,* 996 F.Supp. at 255 (district court relied on transcript of final findings made at zoning hearing to uphold denial of special use permit).

## II. Substantial Evidence Under Subsection (B)(iii)

Traditionally, state and municipal zoning decisions have been afforded virtually complete deference by federal courts; issues of land use are distinctly local and therefore fall on the state-side of the federalism divide. *See, e.g., Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("The power of local governments to zone and control land use is undoubtedly broad."); *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 828 (4th Cir. 1995) ("Land-use decisions are a core function of local government."); *River Park,* 23 F.3d at 167 ("[S]o far as the Constitution is concerned .... State and local governments may regulate and even take property; they must pay for what they take but they are

---

**12.** Section 557(c) requires agency decisions to include "a statement of (A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record; and (B) the appropriate rule, order, sanction, relief, or denial thereof."

**13.** If the Board complied with this requirement, a copy of the written findings has not been included in the record before this Court.

free to use the land as they please."). Prior to the Act, federal courts refused to interfere in zoning decisions absent a constitutional violation. *See Schad,* 452 U.S. at 68, 101 S.Ct. 2176 ("[T]he zoning power is not infinite and unchallengeable; it must be exercised within constitutional limits.") (quotation omitted); *Coniston Corp.,* 844 F.2d at 463–64 (the only federal claims available to a plaintiff challenging a local zoning decision arise under the federal Constitution); *see also River Park,* 23 F.3d at 165 ("Federal courts are not boards of zoning appeals."). It goes without saying, however, that establishing a constitutional violation in a zoning case is remarkably difficult. *See River Park,* 23 F.3d at 165 (noting that no property owner has ever prevailed on a zoning claim in the Seventh Circuit).

Congress, however, has changed the zoning equation. Under the Act, when the land-use decision has to do with the construction and placement of personal wireless facilities, Congress now proscribes special use denials absent substantial evidence that the special use does not satisfy local regulations. Congress explicitly defined substantial evidence as "the traditional standard used for judicial review of agency actions." 142 Cong.Rec. H1078, at § 704 (H.R.Conf.Rep.104–458).

■ The substantial evidence test as used to review agency adjudicative decisions is exceedingly well know. "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Geske & Sons, Inc. v. NLRB,* 103 F.3d 1366, 1374–75 (7th Cir.1997) (quotation and citations omitted). The standard is deferential, and forbids the reviewing court from engaging in its own fact finding or supplanting an agency's reasonable determinations. *J.C. Penney Co. v. NLRB,* 123 F.3d 988, 993 (7th Cir.1997).

■ But "deferential review does not equate with no review at all. The inquiry still must be thorough and probing." *Wisconsin Cent. Ltd. v. Surface Transp. Bd.,* 112 F.3d 881, 886 (7th Cir.1997) (quotation omitted). Furthermore, substantial evidence is "viewed in light that the record in its entirety furnishes, including the body of evidence op-posed to the Board's view." *J.C. Penney,* 123 F.3d at 993 (quotation omitted). In other words, a "reviewing court must take into account contradictory evidence in the record," *American Textile Mfr. Inst., Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), and "set[ ] aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial." *J.C. Penney,* 123 F.3d at 993 (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)); *see Stonington,* 12 F.Supp.2d at 252.

■ Under this standard, unsupported constituent testimony opposing cellular tower location generally will not satisfy the substantial evidence test. We qualify this conclusion because it is conceivable that a cellular service provider could produce no evidence in support of its application, in which case even unsupported equivocal remarks could satisfactorily support a special use denial. But, in general, service providers attend zoning hearings well-armed with extensive evidence justifying their efforts to secure special use permits. Additionally, that evidence tends to be in the form of expert reports and testimony that their special use satisfies the local land-use regulations. In the face of such evidence, something more is required than mere constituent opposition to a tower.

We reject the Fourth Circuit's wholly deferential approach—distinguishing between the "reasonable mind" of a legislator and the "reasonable mind" of an ALJ and evaluating evidence according to the former. We suspect that that court is entirely correct that legislators will find the opinions of angry constituents compelling. But validating this reasoning would nullify Congress' goals of reducing regulation, rapidly deploying new telecommunications technologies, and providing nationwide cellular services; it would allow a small number of constituents to defeat the placement of telecommunications towers in locations necessary to accomplish these congressional goals. We cannot believe Congress intended this result when it reserved authority to local governments over the construction and placement of cellular towers.

We recognize that applying a judicial standard to a legislative decision is problematic. *See Coniston Corp.*, 844 F.2d at 468 ("[A]s is usually true of zoning, the Board's decision to approve or disapprove a site plan is a legislative rather than adjudicative decision."). Legislative acts simply do not comfortably fit judicial standards of review. *See id.* ("The decision whether and what kind of land uses to permit does not have the form of a judicial decision. The potential criteria and considerations are too open-ended and ill-defined."); *see also Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 46 (1st Cir.1992) (embroiling federal courts in zoning decisions would "involve them in political disputes better left to local governments."). One reason for this discomfit is that, in the context of agency actions, the substantial evidence test is applied to evidence adduced during quasi-judicial proceedings, not village board meetings that are neither fully nor properly transcribed.[14] In this case, the record of the zoning proceedings is woefully inadequate in comparison with records compiled during agency hearings. Because the Village bears the burden of demonstrating substantial evidence supporting its decision, *see C–Call Corp.*, 298 Ill.App.3d 1128, 233 Ill.Dec. 136, 700 N.E.2d 441, 443, the abysmal state of the record greatly impacts its case.

The Village claims that the Trustee Minutes "clearly reflect the reasons for the denial", (Response Br. at 9); namely, the negative aesthetic impact of the tower, the failure of PrimeCo to explore alternate sites, and the inability of PrimeCo to demonstrate any benefit to the Village. This contention, though, is somewhat disingenuous. Anyone characterizing the Trustee Minutes (reproduced in full *supra* at ——) as "clear" would fail the straight-face test. Furthermore, reading the minutes generously, we see reference to only two of the reasons cited by the Village: the negative visual impact of the tower, and the lack of benefit to the Village. Moreover, Trustee Hunter's statement be-

speaks more concern with PrimeCo's failure to communicate and work with the newly elected Village Trustees than with the negative visual impact of the proposed tower. In any event, viewing the record in the light most favorable to the Village, we address each claim in turn.

### A. The Negative Visual Impact of the Proposed Tower

The Village's strongest argument in support of its decision is that a 150–foot tower would be an eyesore to adjacent property owners. Additionally, it contends that if located on the Hellios Site, the tower would be the first thing tourists saw when entering the Village. It is not entirely clear, however, that the Trustees could legitimately consider the visual impact of the tower when deciding PrimeCo's application. Ordinance 9–1–6–10 does not explicitly include visual impact as a basis for decision. Additionally, some state court decisions suggest that zoning decisions "may not be based alone on aesthetic considerations." *LaSalle Nat'l Bank v. City of Evanston*, 57 Ill.2d 415, 312 N.E.2d 625, 634 (Ill.1974); *see Cosmopolitan Nat'l Bank v. County of Cook*, 103 Ill.2d 302, 82 Ill.Dec. 649, 469 N.E.2d 183 (Ill.1984) ("This court has held that aesthetic considerations cannot be the sole justification of a zoning ordinance, but the fact that a zoning ordinance is partially based on aesthetic concerns does not make it invalid."); *but see LaSalle Nat'l Bank*, 312 N.E.2d at 634 ("However, there would appear to be significant authority [from non-Illinois state court decisions] that aesthetic factors may, in some instances, be used as the sole basis to validate a zoning classification.") (citing *People v. Stover*, 12 N.Y.2d 462, 240 N.Y.S.2d 734, 191 N.E.2d 272 (N.Y.1963)). It is unclear whether the absence of a factor in a zoning ordinance precludes consideration of that factor by Village Trustees and whether Illinois courts continue to prohibit zoning decisions based solely on aesthetic considerations, and there-

---

**14.** Neither the Constitution nor the Act dictate judicial-style hearings. *See River Park*, 23 F.3d at 166 (Under the Constitution, "municipalities need not use adjudicative procedures to make zoning decisions."). Perhaps, the practical effect of the Act will be the implementation by zoning authorities of adjudicatory procedures, again, in an effort to insulate their decisions. *See Pennhurst*, 451 U.S. at 27, 101 S.Ct. 1531 (Discussing "the well-settled distinction between congressional 'encouragement' of state programs and the imposition of binding obligations on the States.").

fore we proceed to analyze the evidence concerning the negative visual impact of Prime-Co's proposed tower.

The record does not contain any hard evidence that the tower would be visible from nearby residences or even out-of-step with other structures in the area: no neighbors testified on the record that they would be able to see the tower from their livingroom; the Village did not conduct a "balloon test" [15]; and there are no pictures or maps in the record suggesting that the tower would be visible from nearby residences (which, the record tells us, were more than 500 feet away) or ugly in comparison to nearby structures. *Compare Ho–Ho–Kus*, 24 F.Supp.2d 359, 1998 WL 758684, at 7–11 (evidence consisted of photographs from the backyards of nearby residences; expert testimony that the proposed tower failed to satisfy numerous setback and bulk requirements, and that the site was too small for the size of the proposed tower; and testimony that two of the nearby residences were within 290 feet, and at least 23 residences were within 500 feet, of the proposed tower); *North Stonington*, 12 F.Supp.2d at 255 (cellular service provider admitted that an appropriate, less-visually impacting alternate site existed); *Farmington*, 3 F.Supp.2d at 183 (evidence included photographs showing "the heights of the buildings that are near the [proposed site] as well as the hilly areas, the tress, the cemetery, and .... the various heights and various buffers and tree lines and elevations that are in this general area."); *Willoth*, 996 F.Supp. at 258 (computer-generated diagrams showed that an adequate alternate site existed that zoning authority believed would have less negative visual impact on

community).[16] In fact, the only evidence that the tower would have a negative visual impact is the statement by Zoning Board member Bob Warden that more neighbors attended the July hearing to complain that the pole would be in their view. (July Minutes at 3.) Additionally, a constituent, Ron Richards, questioned whether the tower is "the first thing that we want people to see as they enter Fox Lake." (July Minutes at 2.)

The Warden and Richards statements alone do not satisfy the substantial evidence test. And, as will become clear later in this opinion, the two statements are the only evidence supporting the Village's denial of PrimeCo's application. Bob Warden's statement does not identify the complaining neighbors, their addresses, or even the number of complaining neighbors. Nor does Warden's statement disclose how the complaining neighbors established that they would be able to see the proposed tower—if in fact they did establish visibility as a factual matter. Warden's statement is simply too vague to support the Trustees' denial.

Similarly, Ron Richards' statement is insufficient to support the denial. His question seems off-the-cuff, another way of complaining that the tower will be ugly. But again, there is no evidence in the record demonstrating that anyone entering the Village would see the tower first, or even notice it after entering the Village. The Village argues that it is common sense that tourists (and neighbors) will be able to see a 150–foot structure—but there is simply no evidence in the record to support this assertion.

▪ We conclude that the Village's zoning record does not contain substantial evidence

15. A balloon test involves floating a brightly-colored helium balloon from the proposed site of a tower at the proposed height of the tower. The test allows surrounding property owners to competently testify as to their ability to see the tower from their property. *See, e.g., Gwinnett County*, 944 F.Supp. at 926 (cellular service provider used balloon test to prepare a line-of-sight survey from various locations surrounding the proposed tower site). Variations on the balloon test exist; for example, in *Ho–Ho–Kus*, the borough conducted a similar test using a crane constructed to simulate the communications tower at issue there. 24 F.Supp.2d at 370, 1998 WL 758684.

16. We do not mean to suggest that the Act requires the Village to implement the extensive

procedures utilized by zoning authorities in New Jersey, or that the existence of an alternate site necessarily justifies denying a special use application under the Act. We emphasize again, the circumstances of each case—in fact, the local zoning ordinances in each case—are different; accordingly, the evidence necessary to satisfy the substantial evidence test will depend on the facts of each case. We wish, however, to direct the Village's attention to one court's suggestion that, if no appropriate alternate site exists, aesthetic concerns alone cannot constitute substantial evidence. *North Stonington*, 12 F.Supp.2d at 255 (dictum).

supporting the Village's contentions that the tower would be an eyesore to nearby residents or an ugly first-sight to tourists entering the Village.

### B. PrimeCo's Failure to Explore Alternate Sites for the Tower

The Village's zoning record contains absolutely no evidence that PrimeCo failed to explore alternate sites. The record shows that PrimeCo investigated two water towers and "a site at Route 134 and Route 12", but found those sites inappropriate because they were located too close to other cellular towers. The Village points to five worksheets, each allegedly representing a different appropriate location in and around the Village. These documents were created by PrimeCo after the denial of a permit for the Hellios Site and, therefore, cannot be evidence relied upon by the Village Trustees to deny PrimeCo's application.

### C. No Benefit to the Village

■ Finally, the Village argues that it denied PrimeCo's application because it would not derive any benefit from the tower; instead, only people driving through the Village would benefit. As a factual matter, this contention is simply wrong; Village residents would receive cellular telephone service (which, at least in July 1997, appears to have been marginal (*see* July Minutes at 2)) and emergency service providers could "piggyback" on the state-of-the-art equipment. Although it may be true that approving the Hellios Site would not result in the economic benefit the Village could expect if the tower were to be located on Village property, this does not translate into "no benefit" for the Village. In any event, the Ordinance does not require the Village to benefit, and thus this may not be a proper consideration.

In sum, this flimsy record simply does not support the Village's denial of PrimeCo's special use application under the substantial evidence standard. The scant evidence of visual blight is too vague and, in any event, wholly unsubstantiated and thus cannot constitute substantial evidence. Additionally, the Village zoning record contains no evidence that PrimeCo did not explore alternate locations for the tower or that the Village would derive no benefit from the tower. Having conclud-

ed that the Village's denial of PrimeCo's special use application was not supported by substantial evidence contained in the written record and, therefore, that the Village violated 47 U.S.C. § 332(c)(7)(B)(iii), we turn now to the issue of an appropriate remedy.

### REMEDY

■ PrimeCo seeks a writ of mandamus instructing the Village to issue a special use permit for the Hellios Site. PrimeCo assumes without argument that, if it prevails on the substantive issues, it is entitled to mandamus relief. We disagree. The Telecommunications Act does not specify the appropriate remedy under these circumstances. We conclude that comity and the Act's explicit reservation of zoning authority to state and local governments militate against direct mandamus relief. Additionally, as we have reviewed herein, the law as to what constitutes a sufficient written decision and substantial evidence under the Telecommunications Act is largely unsettled in this circuit and in this federal district. That a case raises an issue of unsettled law always weighs against mandamus relief. For these reasons, we decline PrimeCo's request for a writ of mandamus.

Instead, this Court elects to exercise its discretionary power under the Declaratory Judgment Act, 28 U.S.C. § 2201, and declares the Village in violation of 47 U.S.C. § 332(c)(7)(B)(iii). The case is remanded to the Village Trustees for further action in conformity with this opinion. Additionally, the Village has sixty days to grant the application or conduct additional evidentiary hearings and decide the issue anew on the basis of an expanded record. Whether the Village chooses to grant the application without further proceedings or to conduct additional hearings, the application must be decided within sixty days. Should the Village choose to conduct additional hearings, PrimeCo must be afforded the opportunity to submit evidence. This Court retains jurisdiction to enforce this judgment.

### CONCLUSION

For the reasons stated in this opinion, we grant summary judgment in favor of PrimeCo and against the Village of Fox Lake. We

deny the Village's cross-motion for summary judgment. We remand the case to the Village Board of Trustees for additional proceedings in accordance with, and within 60 days of, this opinion. We retain jurisdiction to enforce the judgment.

The Clerk of the Court is instructed to enter judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of PrimeCo.